DREW, J.
Lin this priority dispute between banks over deposited funds, Community Trust Bank appeals a judgment rejecting its claim to the funds. We affirm.
FACTS
Ruston Timber was in the business of procuring timber, either standing timber or from outside producers, and then selling it directly to buyers. Ruston Timber was owned and operated by Ronald Cardwell. His wife, Debra Cardwell, was Ruston Timber’s Secretary and Treasurer. Ru-ston Timber utilized a banking relationship with Community Trust Bank (“CTB”) to finance these activities. CTB perfected its secured interest in Ruston Timber’s collateral by filing UCC-1 financing statements. The first of these financing statements was recorded on March 18, 1998, and it stated that it covered:
All Inventory, Accounts, and General Intangibles; together with the following specifically described property: ALL INVENTORY OF CUT TREES AND LOGS NOW OWNED LOCATED IN THE NW 1/4 OF SECTION 4, TOWNSHIP 17 ...; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all related equipment, and all related accounts, chattel paper, documents, and general intangibles; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, chattel paper and accounts proceeds) and all related general intangibles.
Subsequently, 17 additional UCC-1 financing statements were filed by CTB that listed Ruston Timber as the debtor. These additional financing statements contained language similar to that quoted above, and each financing statement began its collateral description with “All Inventory.” Each of the 18 financing statements contained a property description of a |2different location following the “together with the following specifically described property” language. Moreover, all but one financing statement referred to cut timber or cut logs at these locations, with the one exception referring to standing timber.
We note that the financing statements introduced as Exhibits P-15 and P-16 each actually contain two financing statements, a UCC-1 (for non-farm products) and a UCC-1F (for farm products). Attached to these UCC-lFs is a collateral description which reads, “Crops; together with the following specifically described property: ALL CUT TIMBER LOCATED ON THE ... TIMBER TRACT....” However, as already noted, the UCC-1 in P-15 and in P-16 contains similar language to that found in the other UCC-1 financing statements filed by CTB.
The Cardwells eventually decided to open up a woodyard in Simsboro to expand their business activities. Ruston Timber and CTB executed a commercial security agreement on December 28, 1999. It described the collateral as:
All inventory, chattel paper, accounts, equipment and general intangibles, together with the following described *500 property: MORE SPECIFICALLY ALL CUT TIMBER LOCATED ON THE RUSTON TIMBER COMPANY, INC., WOODYARD LOCATED AT 165 WOODLAND DRIVE, SIMSBORO, LA.
The commercial security agreement further stated that the collateral includes “any and all of Grantor’s present and future inventory (including consigned inventory) ... no matter where located.... ” The UCC-1 (‘Woodyard UCC-1”) perfecting this security interest was recorded in Lincoln Parish on December 29, 1999, and it stated that Recovered:
All Inventory, Chattel Paper, Accounts, Equipment, and General Intangibles; together with the following specifically described property: MORE SPECIFICALLY ALL CUT TIMBER LOCATED ON THE RUSTON TIMBER COMPANY INC., WOODYARD LOCATED AT 165 WOODLAND DRIVE, SIMSBORO, LA; whether any of the foregoing is owned now or acquired later; all accession, additions, replacements, and substitutions relating to any of the foregoing; all documents and instruments; all related equipment, all related fixtures, and all related accounts, chattel paper, documents, and general intangibles; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, chattel paper and accounts proceeds) and all related general intangibles.
On October 11, 2000, Ruston Timber opened up an account at First National Bank (“FNB”) in the name of Ruston Timber-Simsboro Woodyard. The account agreement provided a right of setoff. On November 1, 2000, Ruston Timber opened a second account at FNB. This second account was in the name of Ruston Timber and was a savings account, and this account agreement also provided a right of setoff.
On November 2, 2000, Ruston Timber and FNB executed a promissory note in the amount of $300,000 to acquire timber deeds. The note offered a revolving line of credit. Gary Brannon was President and CEO of FNB at the time. He recalled that Ruston Timber borrowed approximately $360,000 from FNB through four promissory notes, although only one note involved timber. In addition to financing Ruston Timber’s timber operations, FNB refinanced the Cardwells’ home and financed the purchase of two vehicles.
After January 1, 2001, no additional money was generated by the sale of timber from the Simsboro woodyard. Debbie Cardwell estimated that RRuston Timber stopped buying and selling wood from the woodyard in June of 2000 because they were losing money. Ronald Cardwell testified that the woodyard stopped taking wood around January 1, 2001.
Peyton Dowell is the Vice-President and Chief Collections Officer for CTB in the Special Assets Department. Dowell handles past-due accounts and loans. Ruston Timber’s account was turned over to him on June 11, 2001. Dowell testified that Ruston Timber still owed over $100,000 to CTB at the time of trial. Dowell estimated that at one time Ruston Timber’s loan balance was $700,000.
The Cardwells met with FNB’s officers on June 13, 2001, regarding Ruston Timber’s loans. Brannon had scheduled the meeting after learning that Ruston Timber had cut timber that had been financed by FNB and did not apply the proceeds to its indebtedness to FNB. Brannon considered Ruston Timber to be in default of its loans at that time. Later that day, FNB notified the Cardwells by letter that it had frozen the two Ruston Timber accounts as *501 well as an account in Debbie Cardwell’s name.
On June 14, 2001, Dowell faxed a letter to FNB alerting FNB that based upon the December 28, 1999, commercial security-agreement, CTB was claiming all deposits as proceeds arising out of the sale of secured collateral. This notice was delivered to FNB by certified mail on June 15, 2001. Ronald Cardwell testified that this letter may have been prompted by his telling an employee of CTB that FNB had frozen his accounts.
On June 15, 2001, letters were sent to Ruston Timber and Debra Cardwell from FNB notifying them that FNB had exercised its right of |Bsetoff against the accounts. These letters were delivered by certified mail on June 18.
A request for a debit of $20,289 against the Ruston Timber-Simsboro Woodyard account at FNB was made on June 15, 2001. A request for a debit was also made against Ruston Timber’s savings account and Debra Cardwell’s account on the same date; however, the funds in those accounts are not at issue in this matter. The balance statement for the checking account shows that the “force post debit” of $20,289 did not take place until June 18. Nevertheless, Brannon testified that the setoff took place on June 15. Brannon further explained that tickets were written for the setoff on June 15, and the tickets were taken to a data center in West Monroe where the debits are physically done.
On July 3, 2001, Brannon wrote to Do-well that FNB was rejecting CTB’s claim because FNB’s pledge and right of setoff primed any claims that CTB would have to the amount on deposit.
CTB filed suit on November 21, 2001, alleging that it held a security interest in all inventory, chattel paper, accounts, equipment and general intangibles of Ru-ston Timber as reflected in a copy of the wood yard UCC-1 attached as an exhibit to the petition.
Following a trial on the merits, the trial court rendered judgment dismissing CTB’s claims against FNB.[1] In its ruling, the trial court concluded that the evidence failed to show that CTB had- a security interest [ fiin any standing timber from which monies were derived for deposit to the FNB account. The trial court further concluded that the security agreement and Woodyard UCC-1 did not adequately notify third parties that a particular lot of cut timber was subject to the security interest. CTB appealed.
DISCUSSION

Notice of CTB’s Security Interest

The initial issue before this court is whether CTB’s Woodyard UCC-1 provided FNB with sufficient notice of CTB’s security interest in Ruston Timber’s assets. The trial court concluded that nothing in the subject descriptions of the security agreement or UCC-1 would put a reasonable party on notice that a particular tract of cut timber located somewhere was subject to CTB’s security agreement. In reaching this conclusion, the trial court erroneously applied the chattel mortgage law, specifically La. R.S. 9:5352, instead of the Chapter 9-UCC articles, which were in existence at the time that CTB executed its security agreement with Ruston Timber.
Chapter 9, modeled after Uniform Commercial Code Article 9, became effec *502 tive in Louisiana on January 1, 1990. Chapter 9 was later amended and reenacted by Act 128 of 2001, with an effective date of July 1, 2001. La. R.S. 10:9-702(a) states that except as otherwise provided, “this Chapter applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before July 1, 2001.” Accordingly, Chapter 9 governs the sufficiency of the notice provided by CTB’s financing statements.
_JjLa. R.S. 10:9-502(a) provides that a financing statement is sufficient if it indicates the collateral covered by the financing statement. Regarding the indication of collateral, La. R.S. 10:9-504 states, in part:
A financing statement sufficiently indicates the collateral that it covers if the financing statement provides:
(1) a description of the collateral pursuant to R.S. 10:9-108;
(2) an indication that the financing statement covers all assets or all personal property; or
[[Image here]]
Professor Thomas Harrell has written about what constitutes a sufficient indication of collateral in the financing statement:
The financing statement is neither intended nor designed to permit one to determine from the public records whether or to what extent particular collateral may actually be encumbered. The filing merely serves as a warning to the public that a security interest may exist. The statement is required only to identify the debtor, a secured party, and the collateral that may be subject to its terms. A general statement that it covers “inventory,” “equipment,” “accounts,” is sufficient to put third persons on notice that all such property of the debtor, wherever located and whenever acquired is or may be encumbered.
Thomas A. Harrell, A Guide to the Provisions of Chapter Nine of Louisiana’s Commercial Code, 50 La. L.Rev. 716, 738 (1990).
The Woodyard UCC-1 contained a general statement that it covered “All Inventory, Chattel Paper, Accounts, Equipment, and General Intangibles ...” Such language was sufficient to place FNB on notice that CTB may have a secured interest in Ruston Timber’s assets.
FNB argues that the scope of the Wood-yard UCC-1 is limited by the language:
... together with the following specifically described property: |sMORE SPECIFICALLY ALL CUT TIMBER LOCATED ON THE RUSTON TIMBER COMPANY INC., WOODYARD LOCATED AT 165 WOODLAND DRIVE, SIMSBORO, LA
We disagree. The choice of the words “together with” means that CTB gave notice that its collateral covered the cut timber at the wood yard in addition to all of Ruston Timber’s inventory, chattel paper, accounts, equipment, and general intangibles. It is also of no significance that the reference to the cut timber at the wood yard was entirely capitalized. As explained by James Jones, the Senior Vice-President of Commercial Lending for CTB, the sections of the UCC-ls that are capitalized are the sections where information was filled in on a form. There was no intent to supply any special emphasis with the use of all capital letters in certain sections of the financing statement.
The scope of the Woodyard UCC-1 is not limited merely by the fact that CTB filed numerous financing statements with similar language apart from the property description. The 18 financing statements listing Ruston Timber as debtor were filed by CTB between March of 1998 and November of 2000. In fact, one of these *503 other UCC-ls was also recorded on December 29, 1999, the same date the Wood-yard UCC-1 was recorded. Jones, who became Ruston Timber’s loan officer at CTB in June of 2000, described the multiple UCC-1 filings as “overkill” because he believed that the “all inventory” language in the UCC-1 recorded in March of 1998 covered all cut timber wherever located that was acquired by Ruston Timber. Jones also thought it was unnecessary to use the words “cut timber” after using the words “all inventory” in the same document. Jones explained that the “cut | ptimber” language in the property description in the financing statements was used to identify what the particular loan was for rather than to act as a limit on the actual collateral.
The language in the Woodyard UCC-1 was sufficient to alert FNB to the possibility of CTB having a secured interest in Ruston Timber’s assets. However, FNB apparently never performed a lien search that would have placed it in a position to be alerted. Gary Brannon was a member of FNB’s loan committee which approved the loans to Ruston Timber. Brannon stated that he did not know if, prior to issuing the fine of credit, FNB had even done a UCC search to determine if it would be in a first lien security interest position, even though it was part of FNB’s loan policy to do so. Brannon added that he did not have anything in his file to show that a lien search had been performed by FNB.
Accordingly, we conclude the trial court erred as a matter of law in determining that the Woodyard UCC-1 did not give adequate notice to third-parties that CTB may have a security interest in FNB’s assets.

CTB’s Security Interest

The next issue before this court is whether CTB had a security interest in the money that was in the Ruston Timber-Simsboro Woodyard account at the time of the setoff. Although this court would generally approach this issue under the manifest error standard of review, we will use a de novo standard of review as a result of our earlier conclusion that the trial court erred as a matter of law on the notice issue. Where one or more trial court legal errors interdict the fact-finding process, the manifest error 1 instandard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.02/20/95), 650 So.2d 742.
CTB presented testimony showing that the following checks were deposited into the Ruston Timber-Simsboro Wood-yard account at FNB between June 4, 2001, and June 13, 2001:
Date of Check amount
deposit and payor_Check date
6-04-01 $6,508.26 from Georgia Pacific 05-30-01
$100.00 from Willamette 05-31-01 _Indústries_
_$27.00 from Barnes Hardwood 06-01-01
06-05-01 $300.00 from S & W Logging 06-04-01
06-06-01 $17,399.80 from International 06-05-01 _Paper_
$1,051.96 from Source One Ou- 05-31-01 _, chita, Inc._
06-07-01 $1,416.12 from Willamette 06-06-01 _Industries_
06-11-01 $1,750.00 from Burns Forest 05-31-01 _Products_
$297.61 from McManus Cycle 06-08-01 _Shop_
$853.28 from Barnes Hard- 06-08-01 _wood, Inc._
$366.00 from Huff Bend Hunt- 06-08-01 _ing Club_
06-13-01 $14,545.28 from International 06-12-01 Paper
In Additional evidence established that on June 8, 2001, a $443.50 check from Ruston Timber to Ronnie Cardwell was deposited into the account, and that on June 13, 2001, a check for $23 from Johnnie Mallory was deposited into the account.
*504 It is uncontested that despite the account referring to the wood yard in its title, this account did not contain any money in June 2001 that was realized from the sale of inventory located at the wood yard. Debbie Cardwell testified in her deposition that some of the money in the account came from harvesting a timber tract that FNB had financed. She also stated that some of the money in the account came from timber that Ruston Timber had purchased without having to borrow money. She explained that this timber was bought on a per unit basis and Ruston Timber paid the original owner of the timber after Ruston Timber had been paid for selling it.
Jones believed that standing timber became part of Ruston Timber’s inventory upon being cut, and then when the timber was sold, it became Ruston Timber’s accounts receivables, and when those accounts were collected upon, the money collected became proceeds in which CTB retained its security interest. Jones stated that the intent of CTB was to have its security interest reach throughout the chain all the way to the proceeds of the timber sales. Jones added that he believed that the language in the security agreement perfected by the filing of the Woodyard UCC-1 gave CTB a superior security interest in the cut timber, even if the tract of timber from which it had been cut had been financed by a party other than CTB.
Proceeds are defined in La. R.S. 10:9-102(a)(64) as:
112(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
(B) whatever is collected on, or distributed on account of, collateral;
(C) rights arising out of collateral;
(D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or
(E)to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.
La. R.S. 10:9-315 provides for the secured party’s rights on disposition of collateral and in proceeds. It states in subsection (a):
Except as otherwise provided in this Chapter:
(1) a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien;
(2) a security interest attaches to any identifiable proceeds of collateral; and
(3) a purchaser of collateral incurs no personal liability on account of an unauthorized transfer unless he has failed to act in good faith.
Regarding when commingled proceeds are identifiable, subsection (b) of the statute states:
Proceeds that are commingled with other property are identifiable proceeds:
(1) if the proceeds are goods, to the extent provided by R.S. 10:9-336; and
(2) if the proceeds are not goods, to the extent that the secured party identifies the proceeds by an acceptable method of tracing.
1 ^Although it is clear that most of the money deposited into the account from June 4 to June 13 is related to timber, the evidence does not establish exactly which amounts were proceeds of CTB’s collateral. CTB was obviously hampered by the Cardwells’ assertion of the 5th Amend *505 ment privilege, but nevertheless, this does not obscure the fact that there was no testimony presented from anyone else with specific knowledge of how and where the funds were generated.
CTB argues that the proceeds are identifiable as being from CTB’s collateral because the proceeds were derived from the sale of cut timber, and all cut timber that was in Ruston Timber’s possession was part of Ruston Timber’s inventory in which CTB had a security interest. CTB does not contend that its security interest in Ruston Timber’s “accounts” applies to its bank accounts.
Unlike the requirements for financing agreements, which only demand that the collateral be indicated, the collateral must be reasonably identified in the security agreement. La. R.S. 10:9-108 states:
(a) Sufficiency of description. Except as otherwise provided in subsections (c), (d), and (e), a description of personal property is sufficient, whether or not it is specific, if it reasonably identifies what is described.
(b) Examples of reasonable identification. Except as otherwise provided in subsection (d), a description of collateral reasonably identifies the collateral if it identifies the collateral by:
(1) specific listing;
(2) category;
(3) except as otherwise provided in subsection (e), a type of collateral defined in this Title;
lu(4) quantity;
(5) computational or alloeational formula or procedure; or
(6) except as otherwise provided in subsection (c), any other method, if the identity of the collateral is objectively determinable.
(c) Supergeneric description not sufficient. A description of collateral as “all The debtor’s assets” or “all the debtor’s personal property” or using words of similar import does not reasonably identify the collateral.
(d) Investment property. Except as otherwise provided in subsection (e), a description of a security entitlement, securities account, or commodity account is sufficient if it describes:
(1) the collateral by those terms or as investment property; or
(2) the underlying financial asset or commodity contract.
(e) When description by type insufficient. A description only by type of collateral defined in this Title is an insufficient description of:
(1) a tort claim other than as a form of proceeds under R.S. 10:9-315;
(2) in a consumer transaction, consumer goods, a security entitlement, a securities account, or a commodity account;
(3) a life insurance policy;
(4) a judgment, other than as a form of proceeds under R.S. 10:9-315;
(5) a beneficial interest in a trust;
(6) an interest in an estate; or
(7) a collateral mortgage note.
We note the Uniform Commercial Code Comment to La. R.S 10:9-108:
11RSubsection (b) is subject to subsection (c), which follows prevailing case law and adopts the view that an “all assets” or “all personal property” description for purposes of a security agreement is not sufficient. Note, however, that under Section 9-504, a financing statement sufficiently indicates the collateral if it “covers all assets or all personal property.”
The purpose of requiring a description of collateral in a security agreement under Section 9-203 is evidentiary. The *506 test of sufficiency of a description under this section, as under former Section 9-110, is that the description do the job assigned to it: make possible the identification of the collateral described. This section rejects any requirement that a description is insufficient unless it is exact and detailed (the so-called “serial number” test).
(Emphasis in original.)
A reasonable identification of CTB’s collateral is not provided by the language in the security agreement regarding collateral:
Collateral. The word “Collateral” means individually, collectively, and interchangeably, any and all of Grantor’s present and future rights, title and interest in and to the following described property, together with any and all present and future additions thereto, substitutions therefor, and replacements thereof:
All inventory, chattel paper, accounts, equipment and general intangibles, together with the following described property: MORE SPECIFICALLY ALL CUT TIMBER LOCATED ON THE RUSTON TIMBER COMPANY, INC., WOODYARD LOCATED AT 165 WOODLAND DRIVE, SIMSBORO, LA.
Furthermore, a reasonable identification of collateral is not provided in the section of the security agreement that states that the collateral includes “any and all of Grant- or’s present and future inventory (including consigned inventory) ... no matter where located....”
While the collateral description of “all inventory” is slightly more specific than the explicitly rejected supergeneric descriptions, we conclude |1(ithat in this instance it is not sufficient to reasonably identify as collateral any timber cut from tracts that were not financed by CTB. It is without dispute that none of the money set off in the Ruston Timber-Simsboro Wood-yard account originated from the sale of timber at the wood yard.
It is apparent from the deposition testimony of the Cardwells that they did not agree with the expansive definition of “all inventory” proposed by CTB. Debra Card-well testified that she thought the Wood-yard UCC-1 was supposed to be for a separate line of credit for the wood yard that was different than Ruston Timber’s main company credit line. She believed that it was supposed to cover the inventory and assets of the wood yard itself. Debra Cardwell added that each tract of timber Ruston Timber purchased had a separate note from CTB.
Ronald Cardwell testified that the Woodyard commercial security agreement and UCC-1 arose when he sought financing for the inventory at the wood yard. Ronald Cardwell stated that it was never his intention that the Woodyard security agreement and UCC-1 would cover everything, as he thought the Woodyard UCC-1 would be limited to the wood yard inventory based upon the new UCC-ls being created for each tract of timber purchased. Ronald Cardwell recalled that his loan officer, Sam Ponder, created a $150,000 line of credit for the wood yard, and he still had a separate line of credit for purchasing timber from the woods. Ronald Cardwell testified that it was James Jones who combined everything, put it all under one line of credit, and required him to produce a borrowing base report each week. Jones did not become Ruston Timber’s loan officer until |17after the Woodyard security agreement had been executed.
We also note Jones’ testimony about the listing of collateral on the borrowing base reports, which Jones used to match up the collateral with the line of credit. These *507 reports listed tracts of land (“standing timber” or “timber tract inventory”), chip inventory, wood yard inventory, and outstanding receivables. Jones explained that cut timber was not listed on the borrowing base reports except as wood yard inventory, when it was taken to the wood yard, or as accounts, when it was taken to the mills. On the borrowing base report for May 15, 2000, in regards to a tract listed under “Timber Tract Inventory,” there is a note from a CTB loan officer that “CTB did not finance this tract, and therefore does not have a lien on this timber.” The officer then subtracted the value of the timber from the collateral.
Based upon our de novo review of the record, we conclude that CTB failed to establish that any of the money in the Ruston Timber-Simsboro Woodyard account that was set off by FNB was the identifiable proceeds of CTB’s collateral. Accordingly, it is unnecessary for this court to reach the issue of whether FNB’s setoff rights prime CTB’s Chapter 9 security interests.
DECREE
At CTB’s costs, the judgment is AFFIRMED.

. Neither Debra Cardwell nor Ronald Card-well testified at trial as both asserted their 5th Amendment privilege against self-incrimination. However, a deposition of each was accepted into evidence.