Judgment rendered July 17, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 52,432-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

AGRIFUND, LLC                                    Plaintiff-Appellant

versus

RADAR RIDGE PLANTING CO.,              Defendants-Appellees
INC. AND THOMAS A.
DICKERSON

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Richland, Louisiana
Trial Court No. 45037

Honorable Glen Wade Strong (*Pro Tempore*), Judge

* * * * *

BREITHAUPT, DUBOS, & WOLLESON, LLC    Counsel for Appellant
By:  Robert Alan Breithaupt
     Michael Lee DuBos
     James R. Close
     Jared S. Scheinuk

| | |
|---|---|
| MIXON, CARROLL & FRAZIER, PLLC<br>By: James E. Mixon<br>  James L. Carroll<br>  Rossanna R. McIlwain | Counsel for Appellee<br>Caldwell Bank & Trust<br>Company |
| LAW OFFICE OF BRIAN E. CRAWFORD<br>By: Brian E. Crawford | Counsel for Appellee<br>Franklin State Bank &<br>Trust Company |
| PETTIETE, ARMAND, DUNKELMAN<br>WOODLEY, BYRD, & CROMWELL, L.L.P.<br>By: Joseph S. Woodley | Counsel for Appellee<br>Commercial Capital Bank |
| COOK, YANCEY, KING, & GALLOWAY<br>By: Bernard S. Johnson<br>  Lisa Conly Cronin | Counsel for Appellee<br>Clark A. McCain |
| SMITH & ASSOCIATES<br>By: Leroy Smith, Jr. | Counsel for Appellee<br>Danny A. Dickerson |
| HAMMONDS, SILLS, ADKINS, & GUICE<br>By: Jon Keith Guice<br>  Justin N. Myers<br>  Linda K. Ewbank | Counsel for Appellee<br>Brian Wilson |
| FRILOT, LLC<br>By: David S. Daly<br>  Elliot M. Lonker | Counsel for Appellees<br>David S. Stephens,<br>Lawrence W. Pickett, Jr.,<br>and Lawrence W. Pickett,<br>Jr., APAC |
| SAMUEL T. SINGER | Counsel for Appellee<br>Franklin State Bank &<br>Trust Company |
| MICHAEL E. KRAMER | Counsel for Appellee<br>Franklin State Bank &<br>Trust Company |

* * * * *

Before PITMAN, GARRETT, STONE, COX, and McCALLUM, JJ.

STONE, J., dissents in part with written reasons.

**GARRETT, J.**

This case arises from agricultural loans that were not repaid. The lender, Agrifund, LLC ("Agrifund"), appeals from a trial court judgment granting exceptions of no cause of action as to its claims against eight of the numerous defendants in this case, and the dismissal of those defendants with prejudice. For the reasons stated below, we affirm in part and reverse in part. We find that the plaintiff has alleged a cause of action in conversion against the three banks named as defendants. We find that the plaintiff has not alleged any other causes of action against any of the defendants who filed the exceptions that are before us. The matter is remanded to the trial court for further proceedings.

## SYNOPSIS AND PROCEDURAL BACKGROUND

This matter began on April 14, 2016, with a ten-page petition filed by an agricultural lender, Agrifund, against Radar Ridge Planting Company, Inc. ("Radar Ridge"), a farming entity, and Thomas A. Dickerson ("Dickerson"), as guarantor, to collect money owed under a delinquent agricultural loan and for recognition of a security interest on agricultural products secured under the UCC. The original suit, grounded on promissory notes and security agreements, consisted of 47 paragraphs.

The matter lay dormant until March 1, 2017, when Agrifund filed a "First Supplemental and/or Amended Petition." This pleading adopted all of the original allegations and added 22 additional pages of allegations, for a total of 102 paragraphs of allegations. This petition added 21 additional defendants, whom we will refer to as the (1) Dickerson entities, (2) banks and bank employees with whom Dickerson and his entities did business ("bank defendants"), and (3) accountants who provided services for

Dickerson and his entities ("accounting defendants"). This petition sought damages against the added parties under different legal theories designated as counts. Count One alleged fraud and conspiracy to commit fraud, Count Two alleged racketeering, Count Three alleged unfair trade practices under the Louisiana Unfair Trade Practices Act ("LUTPA"), and Count Four alleged conversion. The petition recited a lengthy history of events in an effort to establish liability on the part of all of the added parties, in addition to still seeking relief against the original defendants on the notes and security interests and damages. The thrust of the amended petition was that the conduct on the part of the added parties either facilitated, caused, or contributed to a massive fraudulent scheme perpetrated by Dickerson against Agrifund.

Exceptions of no cause of action filed by the banking and accounting defendants were sustained by the trial court, which dismissed the claims, but allowed Agrifund time to amend.

On November 29, 2017, Agrifund filed a "Second Supplemental and Amended Petition," which amended many of the existing paragraphs and added additional paragraphs, for a total of 234 numbered paragraphs, in an effort to address the deficiencies noted by the trial court in its opinion sustaining the exceptions. In response, the same exceptors filed more exceptions of no cause of action. The trial court again sustained the exceptions and dismissed the plaintiff's claims against the exceptors.[1]

---

[1] The trial judge who ruled on all of the exceptions of no cause of action was the Honorable Terry A. Doughty. After the rendition of the second judgment, Judge Doughty was appointed as a United States district court judge. Judge Glen Wade Strong has since been appointed as judge *pro tempore* in this matter.

2

Agrifund appealed.  Voluminous briefs and reply briefs were filed. This case was initially argued before a three-judge panel.  Pursuant to La. Const. Art. 5, Section 8(B), the case was later reassigned to a five-judge panel.  Additional briefs were filed.  The matter was argued again before the five-judge panel.  More briefs were then filed.  Hence, a rather unusual delay in handling the appeal has occurred in this case.

The narrow issue before us is whether the trial court erred in sustaining the exceptions of no cause of action filed by the banking and the accounting defendants and dismissing the plaintiff's claims as to these parties.

Following our *de novo* review, and guided by the well-established legal precept that we must assume that all of the well-pled factual allegations are true, we ultimately find that the plaintiff has alleged a cause of action for a claim in conversion against the three banks.  This cause of action was pled only against the banks.  In all other respects, we find that the plaintiff has not alleged any other causes of action against any of the exceptors under the other legal theories pled by Agrifund.

**FACTS**

To evaluate whether the trial court correctly sustained the exceptions in this matter, a detailed examination of all three petitions is necessary.  This task is complicated because the petitions are not succinctly stated or artfully drawn.  Further, none of the loan documents, promissory notes, agricultural security agreements, UCC-1F forms, guaranty agreements, or checks described below were attached to the pleadings.  The trial court chose to rule on the exceptions of no cause of action and pretermitted ruling on the

numerous other exceptions which address some of these deficiencies, so they are not before us.

According to the original petition, in 2015, Agricultural Resource Management ("ARM") extended a crop production loan for that year to Dickerson and one of his farming entities, Radar Ridge. ARM filed a UCC-1F form perfecting its security interest in all future crops and future Farm Services Agency ("FSA") payments for the defendants' cotton, soybean, corn, and rice crops grown in Morehouse, Franklin, and Richland Parishes. In January 2016, the parties agreed to convert the crop production loan to a crop storage loan with Agrifund, an affiliate of ARM. In February 2016, it was discovered that the defendants did not have the grain in storage that they claimed. In April 2016, Agrifund filed its original petition against Dickerson and Radar Ridge seeking payment of the delinquent notes, recognition of its security interests, and damages for nonpayment of the loan.

As set forth above, Agrifund filed a first supplemental and amended petition adding numerous defendants, including Dickerson's father, Danny A. Dickerson, and the "Dickerson entities" comprised of Dickerson Ag Inc.; Kelley Ag Service, Inc.; Dickerson Farming Partnership; Dickerson Agricultural Partnership; B&T Farms, LLC; Tough Luck Farms, LLC ("Tough Luck"); W&T Farms, LLC; Yes Farms, LLC ("Yes Farms"); Tibb Co. Farms, LLC; High Flyers, Inc. ("High Flyers"); and Number Two Farms, LLC ("Number Two Farms"). Agrifund also named as defendants the "bank defendants" comprised of several banks and bank employees, including Clark A. McCain, an employee of Franklin State Bank and Trust Company; Franklin State Bank and Trust Company ("FSB"); Commercial

4

Capital Bank ("Commercial Capital"); Brian Wilson, an employee of Caldwell Bank and Trust Company; and Caldwell Bank and Trust Company ("Caldwell Bank"). Agrifund also included as defendants the "accounting defendants" comprised of Dickerson's accountants and accounting firm, David S. Stephens; Lawrence W. Pickett, Jr.; and Lawrence W. Pickett, Jr., a Professional Accounting Corporation. Finally, Agrifund named as a defendant Crop Production Services, Inc. ("Crop Production Services"), an entity associated with FSB.

Regarding the accounting defendants, Agrifund alleged that they performed accounting services for Dickerson and his entities and conspired with Dickerson in preparation for the 2015 crop year to organize farming entities to engage in improper, fraudulent, and deceptive acts and practices with respect to acquisition of crop loans, conduct of operations, sale of crops, and allocation and disbursement of proceeds from the sale of crops. Agrifund contended that the accounting defendants aided in reactivating High Flyers, an inactive corporation, without the knowledge of the registered agent, William J. Casiday, and used Casiday's tax identification number to defraud creditors, kite checks, launder money, and abscond with the proceeds from crops that were pledged as security for loans. It alleged that the accounting defendants added Scott and Theresa Higdon as partners in the Dickerson Agricultural Partnership without their knowledge, submitted fraudulent documents to FSA to participate in government crop and crop insurance programs, forged signatures on loan documents submitted to FSB, forged signatures to open an account with Crop Production Services, and forged signatures for a loan with Commodity Credit Corporation.

5

As to the bank defendants, Agrifund alleged that McCain, an employee of FSB, signed loan documents benefitting Dickerson with FSB, which included the forged signatures of the Higdons, and that McCain knew of the forgery. FSB and McCain cashed forged instruments, negotiated instruments that Dickerson had no legal right to, converted third party checks to cashier's checks, and McCain endorsed grain elevator checks. Agrifund alleged that FSB passed funds through various accounts with the bank, including Doe Properties, an entity for which McCain controlled the checkbook. Agrifund also alleged that McCain hired harvesters and got farmhands to sign loan agreements, the proceeds of which actually went to Dickerson. According to Agrifund, in December 2015, McCain approved a loan to pay rent on farmland, an expense that should have been included in the crop production loan.

Agrifund claimed that Wilson, at Caldwell Bank, loaned money to Dickerson that was not really a crop loan, cashed checks for Dickerson, and issued cashier's checks. These included checks 1740 and 1743 from Kennedy Rice Dryers ("Kennedy Rice"). Check 1740 was payable to Yes Farms, which did not have a crop loan for 2015 with Caldwell Bank. The check for $406,412.51 was split into two cashier's checks payable to Joseph Blake Lively, the agent for one of the Dickerson entities, who was not aware that the funds were run through his account at the bank. Check 1743 was converted to cashier's checks payable to Dickerson. Agrifund alleges that these transactions were approved by Wilson.

Agrifund alleged that Commercial Capital was involved in a check kiting scheme for Dickerson, ignored his large negative account balances,

6

and gave him a bailout loan of $1,849,646.50, based upon false information regarding delays in harvesting.

Agrifund alleged that all defendants were engaged in fraud and conspiracy to commit fraud; all defendants were engaged in racketeering; all defendants, except the banks, engaged in unfair trade practices prohibited by LUTPA, set forth in La. R.S. 51:1405 et seq.; and that the banks and Crop Production Services engaged in conversion of the proceeds of the sale of the crops which belonged to Agrifund by virtue of its security interests.

Various exceptions were filed, including exceptions of no cause of action. The exceptions of no cause of action were sustained by the trial court in a judgment signed on November 13, 2017. In written reasons for judgment, the trial court found no causal connection between the actions alleged and the disposition of the proceeds from Dickerson and Radar Ridge's crops which were subject to Agrifund's lien. The court stated that there was no showing that the actions of the defendants caused damage to Agrifund. The trial court reasoned that the banks did not have a legal duty to monitor the funds deposited into the accounts in the banks and there was no fiduciary duty between the banks and Agrifund.

Regarding the allegations of fraud and conspiracy to commit fraud, the trial court found that there was no showing of an agreement to defraud Agrifund. As to racketeering, the trial court stated that there was no showing of an alleged enterprise for the purpose of engaging in illegal activity, no showing that the defendants participated in the operation or management of the alleged enterprise, and there was no link between the use of racketeering income and Agrifund's injury. As to the LUTPA claims, the trial court found that LUTPA did not apply to the banks or bank employees.

The trial court found that Agrifund failed to state a cause of action for conversion because there was no alleged act of dominion over Agrifund's property by the defendants, and the defendants were not aware that the funds belonged to Agrifund. The trial court granted Agrifund time to amend its petition to state a cause of action.

Agrifund filed its second supplemental and amended petition on November 29, 2017, which contained 52 more pages of allegations, in addition to adopting all of the previous allegations.[2]  Agrifund alleged that ARM gave crop production loans to Radar Ridge and Dickerson Ag in exchange for promissory notes of $2,683,002 and $2,200,137, respectively, and Dickerson and Radar Ridge granted ARM a continuing security interest in their crops, farm products, equipment, and inventory. The agreement specified that Radar Ridge and Dickerson Ag would not use any of the farm products or inventory for their own purposes without ARM's consent. The petition set forth the numerous farms in Morehouse, Richland, and Franklin Parishes to be covered by the crop production loan. The petition alleged that ARM filed the UCC-1F forms identifying its collateral and securing its interest in the crops of Radar Ridge and Dickerson Ag.

Agrifund further alleged that, on September 9, 2015, it acquired ARM's rights to the Radar Ridge and Dickerson Ag loan. In January 2016, after the loans matured, Dickerson, Radar Ridge, and Dickerson Ag approached Agrifund about replacing the crop production loan with a crop storage loan. Agrifund agreed to the crop storage loan. A new Agricultural

_____

[2] The new petition did not include Crop Production Services as a defendant. On December 6, 2017, the trial court granted the company's motion to be dismissed with prejudice.

Security Agreement ("ASA") was entered and Agrifund secured its position through the filing of a UCC-1F on the defendants' crops. Agrifund alleged that it received by assignment all of the previous positions perfected in the crops by ARM's UCC filings. Dickerson personally guaranteed the loans.

According to Agrifund, in February 2016, it became aware that the amount of grain represented by Dickerson was not in storage. It claimed that Dickerson conspired with the defendants to launder the proceeds from the sale of the crops, knowing that they were secured by perfected security interests of other lenders, including Agrifund.

Agrifund alleged that the defendants acted in concert with Dickerson to divert money away from other creditors to pay debts owed to the defendant banks, and the banks sought to continue their business relationships with Dickerson and the Dickerson entities in order to mitigate their losses.

Regarding the accountants, Agrifund made the same allegations contained in the first amended petition.

Agrifund made extensive allegations regarding FSB and McCain. Agrifund claimed that FSB granted a crop loan for 2015 on the Dickerson Agricultural Partnership crops based upon the forged signatures of the Higdons. The company asserted that FSB knew that the Higdons' signatures were forged.

Agrifund alleged that Dickerson and the Dickerson entities conspired with McCain, FSB, Wilson, and Caldwell Bank to divert funds from the sale of Dickerson entity crops, which was the collateral of Agrifund, and laundered the funds to benefit Dickerson and the banks. According to Agrifund, the banks cashed forged instruments, negotiated instruments to

9

which Dickerson and the Dickerson entities had no rights, and converted third party checks to cashier's checks to launder funds and disguise their source, depriving Agrifund of its security interest in the crops and the proceeds from them.

Agrifund claimed that McCain was Dickerson's accomplice at FSB. The company asserted that many grain elevator checks were endorsed by McCain and internal bank tickets directing the application of funds were in McCain's handwriting. Agrifund alleged that, from September through December, 2015, numerous accounts at FSB were used as "pass-through" accounts to kite checks. The company maintained that three accounts were opened in conjunction with new loans made to Dickerson in early 2015. McCain controlled the checkbook for Doe Properties, another Dickerson entity. Agrifund asserted that it was highly irregular for a loan officer to have control of a customer's checking account. McCain exercised power of attorney on behalf of Crop Production Services, a business that operated in conjunction with FSB and used his power of attorney to negotiate grain checks where Crop Production Services was the payee.

Agrifund urged that McCain received checks payable to FSB and Crop Production Services but, instead of applying the funds to the loans at the bank, McCain paid the proceeds directly to Dickerson. Agrifund claimed that McCain hired harvesters for Dickerson and had farm hands sign loan documents, the proceeds of which were paid to Dickerson.

Agrifund asserted that, in January 2016, Kennedy Rice issued Check 1777 for grain from Farm Serial Number ("FSN") 6492, and Agrifund held

the security interest in the crops from that farm.[3]  The grain was booked under W&T Farms, FSB, and Crop Production Services, and the check was made payable to those entities, even though they did not have a security interest in the crops.  This check was endorsed by McCain, clearing the proceeds for Dickerson's use.

Later in January 2016, Kennedy Rice issued Check 1778, for grain from the same farm, FSN 6492, which was subject to Agrifund's security interest. The check was presented at FSB, payable to W&T Farms, which did not have an outstanding loan with FSB.  The check was endorsed by McCain and given to Crop Production Services.

Agrifund alleged that Wilson and Caldwell Bank diverted funds from a crop loan made to Danny Dickerson in 2014.  Agrifund claimed the funds were given to Dickerson and the Dickerson entities.  Agrifund also claimed that Kennedy Rice issued Check 1740 to Yes Farms and Caldwell Bank, which was given for grain originally booked under Dickerson Ag and to which Agrifund had a security interest.  Yes Farms did not have an account at Caldwell Bank.  These funds were converted to two cashier's checks, one payable to Joseph Blake Lively, who did not appear to be aware of the transaction.  A second cashier's check was also issued from the funds represented by Check 1740.  These checks were used to purchase other cashier's checks in order to launder the funds.  The checks were initialed by Wilson, who should have questioned the source of the money because nothing was due Caldwell Bank.

_____

[3] It appears that the digits in this number are transposed in some of Agrifund's filings.

11

Agrifund alleged that, in December 2015, Kennedy Rice issued Check 1743 to Yes Farms and Caldwell Bank. Agrifund contended that the grain came from one of the farms for which it held a security interest. The check was presented to Caldwell Bank and Wilson approved converting the proceeds to a cashier's check which was deposited to Dickerson's personal account at Winnsboro State Bank.

Agrifund sets forth in its petition that conversion occurred on several occasions. The company maintained that, on August 27, 2015, Caldwell Bank converted four third-party checks to two cashier's checks, payable to Danny Dickerson or Thomas Dickerson, neither of whom had an account at the bank. Wilson initialed each check. Agrifund claimed this was to disguise the source of the grain proceeds checks in derogation of the rights of Agrifund.

Agrifund asserted that, on October 2, 2015, two third-party checks were presented, payable to Yes Farms and Number Two Farms, neither of which had an account at Caldwell Bank. The checks were initialed by Wilson and one cashier's check was issued, which was deposited at Commercial Capital in the name of Tough Luck Farms. Agrifund alleged that this transaction was made to divert funds owed to it by Dickerson and the Dickerson entities.

Agrifund asserted that, on October 19, 2015, two third-party checks payable to Number Two Farms, which had no account at Caldwell Bank, were presented at Caldwell Bank, initialed by Wilson, and reissued as one cashier's check payable to Dickerson.

Agrifund claimed that, on August 31, 2015, Caldwell Bank converted third-party checks to two cashier's checks payable to Dickerson entities and these transactions were approved by Wilson.

On October 23, 2015, Agrifund claimed that Dickerson presented a check payable to Joseph Blake Lively, which was not deposited to his account. Rather, a cashier's check was issued payable to DPF Harvest.

On November 2, 2015, a check payable to B&T Farms, which had no account with Caldwell Bank, was presented and a cashier's check was issued payable to Dickerson Farming Partnership. The check was initialed by Wilson.

On November 5, 2015, two checks drawn on Commercial Capital and payable to Number Two Farms, which did not have an account at Caldwell Bank, were presented at Caldwell Bank and two cashier's checks were issued to Tough Luck Farms. These checks were then deposited at Commercial Capital to cover an overdraft.

Agrifund claimed that, in early December 2015, a check for grain subject to its security interest, payable to Yes Farms and Caldwell Bank, was presented to Caldwell Bank. Yes Farms did not have an account at Caldwell Bank and did not have any outstanding loans there. A cashier's check payable to Dickerson was issued and was approved by Wilson.

Regarding Commercial Capital, Agrifund alleged that the bank assisted Dickerson in his check kiting scheme, and, instead of shutting down Dickerson and the Dickerson entities, the bank gave Dickerson a bailout loan of $1,849,646.50. Agrifund contended that a bank memo associated with this loan falsely stated that the loan was made because Dickerson had weather delays in harvesting his crops.

13

Agrifund asserted that all the defendants engaged in fraud and conspiracy to commit fraud by misrepresenting or suppressing the truth in order to gain an unjust advantage for Dickerson and for themselves. Agrifund claimed the conspiracy involved more than 283 checks which were issued for no legitimate business purpose. The company maintained that the banks were required by banking regulations to monitor Dickerson's transactions and to file reports for transactions they knew or suspected to be suspicious.[4] Agrifund contended that all the defendants engaged in a pattern of racketeering activity under La. R.S. 15:1352. Agrifund asserted that all defendants, other than the banks, engaged in unfair trade practices in violation of LUTPA. Agrifund claimed that only the banks, Caldwell Bank, FSB, and Commercial Capital, committed conversion by improperly diverting the proceeds from the sale of crops, which belonged to Agrifund by virtue of its security interests, to other entities that had no interest in the proceeds.

Exceptions of no cause of action were again filed by the bank defendants and the accounting defendants. After a hearing, the trial court issued written reasons, again sustaining the exceptions as to all the movants. The trial court found: (1) Agrifund failed to allege facts showing causation between the appellees' actions and Agrifund's damages; (2) Agrifund failed to show that the appellees owed a duty to Agrifund; and (3) McCain and Wilson, as employees of FDIC-insured banks, were exempt from Agrifund's LUTPA claims under La. R.S. 51:1406. With regard to the conversion

---

[4] In its later briefs, Agrifund contends that the requirement referred to is 12 C.F.R. §21.11, which sets forth the circumstances in which banks are required to file "suspicious activities reports."

claim, the trial court reasoned that the crop storage loan replaced the crop production loan and that any conduct prior to January 2016 was not the cause of any damage. No analysis, discussion, or consideration of the plaintiff's rights under its security interests was included in the reasons for judgment. The trial court rendered a final judgment dismissing Agrifund's claims against the appellees with prejudice. Agrifund appealed.

## EXCEPTIONS OF NO CAUSE OF ACTION

The peremptory exception of no cause of action is set forth in La. C.C.P. art. 927(A)(5). It tests the legal sufficiency of the petition by determining whether the law affords a remedy on the facts alleged in the petition. *Vince v. Metro Rediscount Co., Inc.*, 18-2056 (La. 2/25/19), 264 So. 3d 440; *Jackson v. City of New Orleans*, 12-2742 (La. 1/28/14), 144 So. 3d 876; *Port City Glass & Paint Inc. v. Brooks*, 52,534 (La. App. 2 Cir. 2/27/19), 266 So. 3d 516; *Pesnell v. Sessions*, 51,871 (La. App. 2 Cir. 2/28/18), 246 So. 3d 686; *Gipson v. Fortune*, 45,021 (La. App. 2 Cir. 1/27/10), 30 So. 3d 1076, *writ denied*, 10-0432 (La. 4/30/10), 34 So. 3d 298. The exception is triable on the face of the petition; and, for the purpose of determining the issues raised by the exception, the well-pleaded facts in the petition must be accepted as true. *Fink v. Bryant*, 01-0987 (La. 11/28/01), 801 So. 2d 346; *Pesnell v. Sessions*, *supra*. No evidence may be introduced at any time to support or controvert the objection that the petition fails to state a cause of action. La. C.C.P. art. 931. An exception of no cause of action should be granted only when it appears beyond doubt that the plaintiff can prove no set of facts in support of any claim which would entitle him to relief. If the petition states a cause of action on any ground or portion of the demand, the exception should generally be overruled. Every reasonable

15

interpretation must be accorded the language used in the petition in favor of maintaining its sufficiency and affording the plaintiff the opportunity of presenting evidence at trial. *Badeaux v. Southwest Computer Bureau, Inc.*, 05-0612 (La. 3/17/06), 929 So. 2d 1211; *Stonecipher v. Caddo Par.*, 51,148 (La. App. 2 Cir. 4/7/17), 219 So. 3d 1187, *writ denied*, 17-0972 (La. 10/9/17), 227 So. 3d 830.

The burden of showing that the plaintiff has stated no cause of action is upon the exceptor. The public policy behind the burden is to afford the party his day in court to present his evidence. *City of New Orleans v. Board of Directors of La. State Museum*, 98-1170 (La. 3/2/99), 739 So. 2d 748; *Port City Glass & Paint Inc. v. Brooks*, *supra*; *Villareal v. 6494 Homes, LLC*, 48,302 (La. App. 2 Cir. 8/7/13), 121 So. 3d 1246.

An appellate court reviews a trial court's ruling on an exception of no cause of action *de novo* because the exception raises a question of law and the lower court's decision is based only on the sufficiency of the petition. *Port City Glass & Paint Inc. v. Brooks*, *supra*; *Mack v. Evans*, 35,364 (La. App. 2 Cir. 12/5/01), 804 So. 2d 730, *writ denied*, 02-0422 (La. 4/19/02), 813 So. 2d 1088. *See also Kinchen v. Livingston Parish Council*, 07-0478 (La. 10/16/07), 967 So. 2d 1137; *Hebert v. Shelton*, 2008-1275 (La. App. 3 Cir. 6/3/09), 11 So. 3d 1197; *Ordoyne v. Ordoyne*, 2007-0235 (La. App. 4 Cir. 4/2/08), 982 So. 2d 899.

We will address each of the four counts in the order alleged by Agrifund.

**FRAUD AND CONSPIRACY TO COMMIT FRAUD**

Agrifund argues that the trial court erred in concluding that the company failed to allege a cause of action against the exceptors for fraud and conspiracy to commit fraud. This argument is without merit.

**Legal Principles**

The definition of fraud is found in the portion of the Louisiana Civil Code dealing with vices of consent to contracts. However, not all fraud actions are contract claims. *Thomas v. North 40 Land Dev., Inc.*, 2004-0610 (La. App. 4 Cir. 1/26/05), 894 So. 2d 1160; *Boudreaux v. Jeff*, 2003-1932 (La. App. 1 Cir. 9/17/04), 884 So. 2d 665. Fraud actions may also constitute a tort, sometimes called deceit. Frank L. Maraist and Thomas C. Galligan, *Louisiana Tort Law* §2.06(10) (2016). When fraud is alleged, all persons who participated in the alleged fraud and those who are beneficiaries are proper parties to the suit. *Thomas v. North 40 Land Dev., Inc.*, *supra*.

Fraud is a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. La. C.C. art. 1953. *See also Benton v. Clay*, 48,245 (La. App. 2 Cir. 8/7/13), 123 So. 3d 212; *Quality Envtl. Processes, Inc. v. IP Petroleum Co., Inc.*, 2016-0230 (La. App. 1 Cir. 4/12/17), 219 So. 3d 349, *writ denied*, 17-00915 (La. 10/9/17), 227 So. 3d 833; *Johnson v. First Nat. Bank of Shreveport*, 2000-870 (La. App. 3 Cir. 6/20/01), 792 So. 2d 33, *writ denied*, 01-2770 (La. 1/4/02), 805 So. 2d 212, *writ denied*, 01-2783 (La. 1/4/02), 805 So. 2d 213.

A claim of fraud based on silence or suppression of the truth requires there to be a duty to speak or disclose information. *Greene v. Gulf Coast*

*Bank*, 593 So. 2d 630 (La. 1992); *Joyner v. Liprie*, 43,233 (La. App. 2 Cir. 5/7/08), 983 So. 2d 257, *writ denied*, 08-1236 (La. 8/29/08), 989 So. 2d 108. While fraud may result from a party's silence or inaction, mere silence or inaction without fraudulent intent does not constitute fraud. Intent to defraud and loss or damage are two essential elements to constitute legal fraud. *Benton v. Clay*, *supra*.

To succeed in a claim for intentional/fraudulent misrepresentations, the petition must contain allegations of: (1) a misrepresentation of material fact, (2) made with the intent to deceive, (3) causing justifiable reliance with resulting injury. *Benton v. Clay*, *supra*; *Systems Eng'g & Sec., Inc. v. Science & Eng'g Associations, Inc.*, 2006-0974 (La. App. 4 Cir. 6/20/07), 962 So. 2d 1089.

In pleading fraud or mistake, the circumstances constituting fraud or mistake shall be alleged with particularity. Malice, intent, knowledge, and other condition of mind of a person may be alleged generally. La. C.C.P. art. 856.

An independent cause of action for civil conspiracy does not exist in Louisiana; rather, the actionable element is the intentional tort that the conspirators agreed to commit or committed, in whole or part, causing the plaintiff's injury. *Coleman v. Querbes Co. No. 1*, 51,159 (La. App. 2 Cir. 2/15/17), 218 So. 3d 665; *Haygood v. Dies*, 48,485 (La. App. 2 Cir. 11/20/13), 127 So. 3d 1008, *writ denied*, 13-2955 (La. 2/28/14), 134 So. 3d 1177; *Hardy v. Easterling*, 47,950 (La. App. 2 Cir. 4/10/13), 113 So. 3d 1178. *See also Ross v. Conoco, Inc.*, 02-0299 (La. 10/15/02), 828 So. 2d 546; *Jeff Mercer, LLC v. State through Dept. of Transp. & Dev.*, 51,371 (La. App. 2 Cir. 6/7/17), 222 So. 3d 1017, *writ denied*, 2017-1442 (La. 12/5/17),

231 So. 3d 625, *cert. denied*, ___ U.S.___, 138 S. Ct. 1566, 200 L. Ed. 2d 746, (2018); *Thames v. Thames*, 50,639 (La. App. 2 Cir. 5/18/16), 196 So. 3d 653.

He who conspires with another person to commit an intentional or willful act is answerable, *in solido*, with that person, for the damage caused by such act. La. C.C. art. 2324(A). The actionable element in a claim under La. C.C. art. 2324 is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate and which they actually commit in whole or in part. The purpose of solidary liability is to compel any tortfeasor to pay an entire judgment. *See Ross v. Conoco, Inc.*, *supra*.

To establish a conspiracy, a plaintiff is required to provide evidence of the requisite agreement between the parties, i.e., the plaintiff must establish a meeting of the minds or collusion between the parties for the purposes of committing wrongdoing. *See Jeff Mercer, LLC v. State through Dept. of Transp. and Dev.*, *supra*; *Crutcher-Tufts Resources, Inc. v. Tufts*, 09-1572 (La. App. 4 Cir. 4/28/10), 38 So. 3d 987.

To establish conspiracy, a plaintiff must prove that: (1) an agreement existed to commit an illegal or tortious act; (2) the act was actually committed; (3) the act caused the plaintiff's injury; and (4) there was an agreement as to the intended outcome or result. *Jeff Mercer, LLC v. State through Dept. of Transp. and Dev.*, s*upra*; *Thames v. Thames*, *supra*; *Crutcher-Tufts Res., Inc. v. Tufts*, *supra*.

**Discussion**

Based upon our *de novo* review of the record, we find that Agrifund failed to state a cause of action against either the accounting defendants or the banking defendants for fraud and conspiracy to commit fraud.

Agrifund argues that it sufficiently stated in its petition that the bank defendants and the accounting defendants acted in furtherance of Dickerson's scheme to divert funds from the sale of crops, which were the collateral of Agrifund, to further Dickerson's failing farm enterprise and to benefit Dickerson and the banks. Agrifund claims that the banks profited from the scheme by receiving interest and bank fees on the transactions engaged in with Dickerson. Agrifund maintains that the banks participated in Dickerson's scheme by aiding in check kiting and money laundering.

Regarding the accounting defendants, Agrifund asserted the same allegations in the first and second amended petitions. Agrifund claimed that the accounting defendants conspired to organize farm entities for Dickerson to engage in improper, fraudulent, and deceptive acts and practices with respect to the acquisition of crops loans, sale of crops, and the allocation of the proceeds from those sales. Agrifund alleged that the accounting defendants aided Dickerson in reactivating High Flyers without the knowledge of its agent, Casiday, and added the Higdons as partners in the Dickerson Agricultural Partnership without their knowledge. Agrifund contended that the accounting defendants aided Dickerson in filing fraudulent documents in order to participate in government crop loans and crop insurance programs. Agrifund also alleged that the accounting defendants aided Dickerson in forging signatures to open accounts with Crop Production Services and obtain loans from FSB and Commodity Credit Corporation.

These allegations do not assert that the accounting defendants misrepresented or suppressed the truth with the intent to obtain an unjust advantage over or cause a loss or inconvenience to Agrifund. There are no

20

allegations that the accounting defendants remained silent when they had a duty to Agrifund to disclose information. There are no allegations that the plaintiff ever relied upon any work performed by the accounting defendants. Agrifund failed to allege that the accounting defendants were even aware of the existence of Agrifund or had any communications or contact with the company. Further, the claims in Agrifund's petitions do not allege that the accounting defendants agreed with and had a meeting of the minds with Dickerson, the Dickerson entities, or any other defendants to engage in fraudulent conduct with the intent to cause injury to Agrifund. Therefore, Agrifund failed to allege fraud or conspiracy to commit fraud against it by the accounting defendants.

Agrifund also failed to state a cause of action for fraud and conspiracy to commit fraud against the banks or bank employees. Agrifund alleged that loan documents were filed with FSB containing the forged signatures of the Higdons and that McCain knew of the forgery. Agrifund claimed that the bank defendants cashed forged instruments and improperly converted third party checks to cashier's checks. Agrifund urged that Kennedy Rice checks were endorsed by McCain. The proceeds from one were deposited at Commercial Capital and the proceeds of another were given to Crop Production Services. According to Agrifund, the bank defendants improperly passed funds through various accounts at the banks. The company alleged that McCain induced farm hands to sign loan applications, but the proceeds were actually paid to Dickerson, and the bank approved a loan to Dickerson to pay rent on farmland when funding for rent should have already come from crop production loans.

21

Agrifund alleged that Wilson and Caldwell Bank loaned money to Dickerson that was not really a crop loan. Agrifund also maintained that Caldwell Bank improperly cashed checks for Dickerson and issued cashier's checks for the money. Agrifund urged that Commercial Capital aided in check kiting and gave Dickerson a bailout loan.

Agrifund claimed that the bank defendants diverted funds from Agrifund for the benefit of Dickerson and the banks. The company urged that the conspiracy involved a large number of checks which were not issued for legitimate business purposes.[5]

Based upon the three petitions filed by Agrifund, the company has failed to allege that the bank defendants misrepresented or suppressed the truth to gain an unfair advantage or to cause a loss or inconvenience to Agrifund. Many of the allegations, such as improperly obtaining crop loans based upon forged signatures, and inducing farm hands to sign loan applications where Dickerson actually received the proceeds, fail to establish a connection with Agrifund or how the activities harmed Agrifund. The allegations regarding cashing checks not payable to Dickerson and issuing cashier's checks for the proceeds, if proven to be true, fail to establish that the actions were done to cause injury or harm to Agrifund. There are no allegations that any of the bank defendants ever had any contact, communications, or dealings with Agrifund. Simply stated, there are no

---

[5] Agrifund relied on the case of *Kuebler v. Martin*, 578 So. 2d 113 (La. 1991), to show that it sufficiently pled a cause of action against the banks for fraud and conspiracy to commit fraud and should be allowed its day in court on these claims. The facts of *Kuebler* are distinguishable. In *Kuebler*, the petition alleged that the bank actively engaged in encouraging the plaintiffs to invest in a Ponzi scheme.

allegations which establish an agreement or meeting of the minds among the bank defendants with Dickerson to commit fraud upon Agrifund.

In summary, fraud occurs when one party intentionally misrepresents or withholds information from another party who relies on the inaccurate information or lack of information and sustains damage as a result. While Agrifund may have sufficiently pled a cause of action against Dickerson for fraud, it failed to sufficiently plead that the accounting defendants or the banking defendants knew that Dickerson was defrauding Agrifund and agreed with Dickerson to act in furtherance of his scheme. Therefore, Agrifund has failed to state a cause of action against the accounting defendants or the banking defendants for fraud and conspiracy to commit fraud.

## RACKETEERING

Agrifund next argues that the trial court erred in concluding that the company failed to allege a cause of action against the exceptors for racketeering. This argument is without merit.

### Legal Principles

The Louisiana Racketeering Act is set forth in La. R.S. 15:1351 et seq. La. R.S. 15:1352 provides, in part:

> A. As used in this Chapter, "racketeering activity" means committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit any crime that is punishable under the following provisions of Title 14 of the Louisiana Revised Statutes of 1950, the Uniform Controlled Dangerous Substances Law, or the Louisiana Securities Law:
> . . . .
>
> (17) R.S. 14:230 (Money laundering).

23

Money laundering is prohibited by La. R.S. 14:230, which provides, in pertinent part:

B. It is unlawful for any person knowingly to do any of the following:

(1) Conduct, supervise, or facilitate a financial transaction involving proceeds[6] known to be derived from criminal activity[7], when the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or the control of proceeds known to be derived from such violation or to avoid a transaction reporting requirement under state or federal law.

(2) Give, sell, transfer, trade, invest, conceal, transport, maintain an interest in, or otherwise make available anything of value known to be for the purpose of committing or furthering the commission of any criminal activity.

(3) Direct, plan, organize, initiate, finance, manage, supervise, or facilitate the transportation or transfer of proceeds known to be derived from any violation of criminal activity.

(4) Receive or acquire proceeds derived from any violation of criminal activity, or knowingly or intentionally engage in any transaction that the person knows involves proceeds from any such violations.

(5) Acquire or maintain an interest in, receive, conceal, possess, transfer, or transport the proceeds of criminal activity.

(6) Invest, expend, or receive, or offer to invest, expend, or receive, the proceeds of criminal activity.

Regarding racketeering, La. R.S. 15:1352 provides:

B. "Enterprise" means any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association, or group of individuals *associated in fact* and includes unlawful as well as lawful enterprises and governmental as well as other entities.

---

[6] La. R.S. 14:230(A)(4) defines proceeds as funds acquired or derived directly or indirectly from or produced or realized through an act.

[7] La. R.S. 14:230(A)(1) defines criminal activity as any offense, including conspiracy and attempt to commit the offense, that is classified as a felony under the laws of this state or the United States or that is punishable by confinement for more than one year under the laws of another state.

C. "Pattern of racketeering activity" means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, principals, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurs after August 21, 1992 and that the last of such incidents occurs within five years after a prior incident of racketeering activity. [Emphasis supplied.]

An association-in-fact enterprise is not the pattern of racketeering activity; it is an entity separate and apart from the pattern of activity in which it engages. Additionally, an association-in-fact enterprise must have a structure. *State v. Sandifer*, 2016-0842 (La. App. 4 Cir. 6/27/18), 249 So. 3d 142, *writs denied*, 18-1316 (La. 3/25/19), 267 So. 3d 593, 18-1261 (La. 3/25/19), 267 So. 3d 599, 18-1310 (La. 3/25/19), 267 So. 3d 600. An association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a chain of command; decisions may be made on an *ad hoc* basis and by any number of methods – by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. *State v. Sandifer*, *supra*. An association-in-fact enterprise must have at least three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *State v. Sandifer*, *supra*, *citing United States v. Turkette*, 452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981).

Continuing on the law regarding racketeering, La. R.S. 15:1353 provides:

25

A. It is unlawful for any person who has knowingly received any proceeds derived, directly or indirectly, from a pattern of racketeering activity to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in immovable property or in the establishment or operation of any enterprise.

B. It is unlawful for any person, through a pattern of racketeering activity, knowingly to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or immovable property.

C. It is unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

D. It is unlawful for any person to conspire or attempt to violate any of the provisions of Subsections A, B, or C of this Section.

Although these statutes are part of the Louisiana Code of Criminal Procedure, they provide for a civil cause of action. La. R.S. 15:1356 provides, in part:

E. Any person who is injured by reason of any violation of the provisions of R.S. 15:1353 shall have a cause of action against any person engaged in racketeering activity who violates a provision of R.S. 15:1353. Such injured person shall be entitled to recover three times the actual damages sustained or ten thousand dollars, whichever is greater. Such person shall also recover attorney fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred.

**Discussion**

Based upon our *de novo* review of the record, we find that Agrifund failed to state a cause of action against the accounting defendants and the bank defendants for racketeering.

Agrifund cites several portions of its second amended petition which it contends state a cause of action against the defendants for racketeering. Paragraph 89 states:

Upon information and belief, Pickett and Stevens [sic] assisted and directed Dickerson with extensive and elaborate check kiting and money laundering scheme detailed herein.

Paragraph 221 alleges:

Dickerson, the Dickerson Entities, Pickett, Stevens [sic], Franklin State Bank, McCain, Caldwell Bank, Wilson and Commercial Capital Bank, worked together for the common purpose of furthering Dickerson's faltering farming enterprise while seek [sic] to profit from its continued existence through coordinated and extensive money laundering and check kiting scheme as described herein. Each of these defendants played a critical and purposeful role within Dickerson's overall scheme, working in concert with and at the direction of Dickerson. These defendants collectively are therefore an "enterprise" as defined by LSA-R.S. 15:1352(B).

Paragraph 222 states:

Defendants' actions as set forth herein constitute a pattern of racketeering activity as defined by LSA-R.S. 15:1352. Defendants have repeatedly and systematically violated LSA-R.S. 14:230 by conducting, supervising, or facilitating financial transactions involving proceeds known to be derived from criminal activity to conceal or disguise the nature, location, source, ownership, or the control of proceeds or to avoid transaction reporting requirements under state or federal law and by knowingly or intentionally engaging in transactions that they knew involved proceeds from criminal activity. Defendants went to great lengths to avoid reporting requirements required by state law and federal banking regulations, in violation of La. R.S. 14:230. Specifically, forged checks were not properly reported in order to both conceal and further money laundering and third-party checks were converted to Cashier's Checks and furthering Dickerson's money laundering scheme. Moreover, internal controls of the respective defendant banks were ignored and/or bypassed in order to further and conceal violations of La. R.S. 14:230.

Agrifund argues that it alleged the existence of an enterprise that is an association-in-fact. The functioning elements were Dickerson and the Dickerson entities; the accounting defendants, who set up the network of Dickerson entities for the purpose of furthering the scheme to defraud Agrifund; and the bank defendants, who provided the channels to divert funds from the sale of crops through money laundering and check kiting.

27

Agrifund claims it alleged that money laundering kept Dickerson's enterprise alive, and the accounting defendants and the bank defendants profited from the scheme. Agrifund also claims that it alleged a connection between the use or investment of racketeering income and Agrifund's injury. The company maintains that this was sufficient to state a cause of action against the accounting defendants and the bank defendants for racketeering.

Agrifund's pleadings do not allege facts which, if proven, would establish that the accounting defendants and the bank defendants operated as a continuing unit, functioning with the common purpose of money laundering in order to harm Agrifund. The company made the conclusory statement that the accounting defendants and the bank defendants participated in the management of Dickerson's association, the enterprise used money laundering to conceal the source of the funds, and that the accounting defendants and the bank defendants profited from the scheme. However, the allegations do not show that there were relationships among the defendants or that the enterprise operated long enough to allow the defendants to pursue the enterprise's purpose. Agrifund simply has not sufficiently alleged that the defendants were engaged in an enterprise to launder money and harm Agrifund. Without an enterprise with the common purpose of harming Agrifund, racketeering could not have occurred. Agrifund failed to state a cause of action against the accounting defendants or the bank defendants for racketeering.

## UNFAIR TRADE PRACTICES

Agrifund urges on appeal that the trial court erred in finding that the company failed to state a cause of action for unfair trade practices under

LUTPA against McCain and Wilson, in their individual capacities, and against the accounting defendants. This argument is without merit.

## Legal Principles

LUTPA provides that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful. *See* La. R.S. 51:1405. A private cause of action for violation of LUTPA is provided in La. R.S. 51:1409(A). Claims under LUTPA are not limited to consumers and business competitors, but are available to any person who suffers any ascertainable loss as a result of violations of the statute. *Haygood v. Dies*, *supra*.

Because of the broad sweep of the language in La. R.S. 51:1405, Louisiana courts determine what constitutes a LUTPA violation on a case-by-case basis. *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co., Inc.*, 13-1582 (La. 5/7/14), 144 So. 3d 1011; *Levine v. First Nat. Bank of Commerce*, 06-0394 (La. 12/15/06), 948 So. 2d 1051; *Foster-Somerled Enterprises, LLC v. St. Paul's Episcopal Church*, 51,063 (La. App. 2 Cir. 1/11/17), 212 So. 3d 1191. The Louisiana Supreme Court has consistently held that, in establishing a LUTPA claim, a plaintiff must show that the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious. *Cheramie Services, Inc. v. Shell Deepwater Prod. Inc.*, 09-1633 (La. 4/23/10), 35 So. 3d 1053; *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co., Inc.*, *supra*; *Levine v. First Nat. Bank of Commerce*, *supra*. The range of prohibited practices under LUTPA is extremely narrow, as LUTPA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence. *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co., Inc.*, *supra*. *See also Cheramie*

*Services, Inc. v. Shell Deepwater Prod. Inc.*, *supra*; *Walker v. Hixson Autoplex of Monroe, L.L.C.*, 51,758 (La. App. 2 Cir. 11/29/17), 245 So. 3d 1088.

**Discussion**

Based upon our *de novo* review of the record, we find that Agrifund failed to state a cause of action against McCain and Wilson, in their individual capacities, and the accounting defendants for violation of LUTPA.

McCain, Wilson, and the accounting defendants were not competitors of Agrifund. The company did not allege facts which, if proved, would show that McCain, Wilson, and the accounting defendants engaged in unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce which were directed at harming the company.

As stated above, the range of practices which violate LUTPA are extremely narrow, and LUTPA prohibits only fraud, misrepresentation, or similar conduct, not mere negligence. Regarding McCain, Wilson and the accounting defendants, as discussed above, Agrifund failed to allege sufficient facts, which if proved, would show that these defendants committed fraud against Agrifund in this matter. Also, there is no showing that any actions these defendants may have engaged in were specifically aimed at causing harm to Agrifund. The facts alleged do not show that there was ever any contact or communication between Agrifund and any of these parties or that the parties were aware of the existence of Agrifund. Because the range of practices that violate LUTPA are extremely narrow and because Agrifund has failed to allege any facts which, if proved, would show fraud, misrepresentation, or similar conduct on the part of McCain, Wilson, or the

30

accounting defendants, Agrifund has failed to state a cause of action against them.

We also note that McCain and Wilson are employees of banks, and banks are exempt from LUTPA.

La. R.S. 51:1406 provides, in pertinent part:

The provisions of this Chapter shall not apply to:

(1) Any federally insured financial institution, its subsidiaries, and affiliates or any licensee of the Office of Financial Institutions, its subsidiaries, and affiliates or actions or transactions subject to the jurisdiction of the Louisiana Public Service Commission or other public utility regulatory body, the commissioner of financial institutions, the insurance commissioner, the financial institutions and insurance regulators of other states, or federal banking regulators who possess authority to regulate unfair or deceptive trade practices.

*See Scott v. Bank of Coushatta*, 512 So. 2d 356 (La. 1987); *Gulf Coast Hous. & Dev. Corp. v. Capital One*, 2016-0296 (La. App. 4 Cir. 10/5/16), 203 So. 3d 366; *Preferred Inv. Corp. v. Neucere*, 592 So. 2d 889 (La. App. 4 Cir. 1991), *writ denied*, 597 So. 2d 1028 (La. 1992). Agrifund recognized that banks are generally exempt from LUTPA claims and did not assert LUTPA claims against the banks. It asserted LUTPA claims against the bank employees, Wilson and McCain, in their individual capacities, maintaining that their actions were not exempt.

In *Gulf Coast Hous. & Dev. Corp. v. Capital One*, *supra*, the fourth circuit found that the bank exemption from LUTPA extended to bank employees who were acting in the course and scope of their employment with the bank. In *Gulf Coast*, the plaintiff corporation opened a bank account with the defendant bank and specifically instructed two bank employees that no debit card should be issued for the account. In spite of these instructions, a board member of the plaintiff corporation obtained a

31

debit card and withdrew a large amount of cash. Also, the bank cashed a forged check from the account. The plaintiff corporation brought LUTPA claims against the two bank employees, in their individual capacities. These claims were dismissed on an exception of no cause of action. The fourth circuit noted the LUTPA exemption for banks, and applied the exemption to the bank employees because they were acting in the course and scope of their employment with the bank.

The facts alleged against McCain and Wilson do not indicate that their actions were outside the course and scope of their employment with their respective banks. Agrifund alleged that McCain, at FSB, endorsed Kennedy Rice checks and deposited the proceeds from one at Commercial Capital and the proceeds of the other were given to Crop Production Services. Agrifund also claims that McCain signed loan documents granting improper crop loans to Dickerson, cashed forged instruments for Dickerson, negotiated instruments that Dickerson was not entitled to, converted third-party checks to cashier's checks payable to Dickerson, induced farm hands to sign loan documents for which Dickerson received the proceeds, and loaned Dickerson money ostensibly to pay rent on farmland.

Agrifund alleged that Wilson approved a loan that was not really a crop loan, cashed checks for Dickerson entities that did not have accounts at Caldwell Bank and issued cashier's checks for the proceeds.

While Agrifund has alleged seemingly improper banking activities on the part of McCain and Wilson, all the allegations concern their work at their respective banks and occurred during the course and scope of their employment with their banks. Accordingly, as in *Gulf Coast Hous. & Dev.*

32

*Corp. v. Capital One*, *supra*, the LUTPA exemption for banks extends to these two defendants.

**CONVERSION**

On appeal, Agrifund argues that the trial court erred in finding that the company failed to state a cause of action for conversion against the three banks. For the following reasons, we reverse the trial court judgment and find that Agrifund adequately stated a cause of action on this claim. In our view, the trial court failed to recognize the significant differences between the first and second supplemental and amended petitions with regard to the rights and claims being asserted by Agrifund. The latter petition contained more detailed allegations pertaining to Agrifund's assertion of rights under both the crop production loan and the crop storage loan, its UCC security interests, the impairment of those rights, and the diversion of the funds that should have been received by Agrifund.

**Legal Principles**

The Louisiana Civil Code itself does not identify causes of action for "conversion." However, causes of action for conversion have been inferred from the codal articles providing that the right of ownership, possession, and enjoyment of movables is protected by actions for the recovery of the movables themselves, actions for restitution of their value, and actions for damages. *Dhaliwal v. Dhaliwal*, 49,973 (La. App. 2 Cir. 11/25/15), 184 So. 3d 773, *writ denied*, 16-0236 (La. 4/4/16), 190 So. 3d 1204.

A conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion. It is of no importance what subsequent

application was made of the converted property, or that defendant derived no benefit from his act. *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So. 2d 756 (La. 1985). *See also Birch v. Birch*, 45,702 (La. App. 2 Cir. 11/3/10), 55 So. 3d 796, *writ denied*, 10-2670 (La. 1/28/11), 56 So. 3d 959.

A conversion is committed when *any* of the following occurs: 1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel. *Dual Drilling Co. v. Mills Equip. Investments, Inc.*, 98-0343 (La. 12/1/98), 721 So. 2d 853; *Boyer v. Kokkinis*, 51,598 (La. App. 2 Cir. 9/27/17), 244 So. 3d 652, *writ denied*, 17-2058 (La. 2/2/18), 235 So. 3d 1112; *Joyner v. Liprie*, *supra*.

The tort of conversion is an intentional act done in derogation of the plaintiff's possessory rights. *Louisiana Health Care Grp., Inc. v. Allegiance Health Mgmt., Inc.*, 2009-1093 (La. App. 3 Cir. 3/10/10), 32 So. 3d 1138. The intent required for a conversion is not necessarily that of conscious wrongdoing. It is rather an intent to exercise dominion or control over the goods which is, in fact, inconsistent with the plaintiff's rights. A mistake of law or fact is no defense. Persons deal with the chattels or exercise acts of ownership over them at their peril, and must take the risk that there is no lawful justification for their acts. *Louisiana State Bar Ass'n v. Hinrichs*, 486 So. 2d 116 (La. 1986); *Jones v. Americas Ins. Co.*, 2016-0904 (La. App. 1 Cir. 8/16/17), 226 So. 3d 537; *Deposit Guar. Nat. Bank v. Central La. Grain Co-op., Inc.*, 1998-1976 (La. App. 3 Cir. 5/5/99), 737 So. 2d 167, *writ*

34

*denied*, 99-1582 (La. 9/17/99), 747 So. 2d 564; *Dileo v. Horn*, 2015-684 (La. App. 5 Cir. 3/16/16), 189 So. 3d 1189.

Although a party may have rightfully come into possession of another's goods, the subsequent refusal to surrender the goods to one who is entitled to them may constitute conversion. *Louisiana Health Care Grp., Inc. v. Allegiance Health Mgmt., Inc.*, *supra.*

Because Agrifund has alleged that its collateral and security interests were violated, certain provisions of the UCC and other statutes must be considered.

"Proceeds" are defined in La. R.S. 10:9-102 (64) as:

(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

(B) whatever is collected on, or distributed on account of, collateral;

(C) rights arising out of collateral;

(D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or

(E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

Regarding the attachment and enforceability of a security interest and proceeds, La. R.S. 10:9-203 provides, in part:

(a) Attachment**.** A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.
. . . .

(f) Proceeds and supporting obligations**.** The attachment of a security interest in collateral gives the secured party the rights to proceeds provided by R.S. 10:9-315 and also includes the rights to a supporting obligation for the collateral.

As to the perfection of an agricultural lien, La. R.S. 10:9-308(b) states:

> Perfection of agricultural lien. An agricultural lien is perfected if it has become effective and all of the applicable requirements for perfection in R.S. 10:9-309 or 9-310 have been satisfied. An agricultural lien is perfected when it becomes effective if the applicable requirements are satisfied before the agricultural lien becomes effective.

La. R.S. 10:9-310(a) and (c) provide:

> (a) General rule: perfection by filing. Except as otherwise provided in Subsection (b) and R.S. 10:9-312(b), a financing statement must be filed to perfect all security interests and agricultural liens.

> (c) Assignment of perfected security interest. If a secured party assigns a perfected security interest or agricultural lien, a filing under this Chapter is not required to continue the perfected status of the security interest against creditors of and transferees from the original debtor.

La. R.S. 10:9-311(a)(2) states:

> (a) Security interest subject to other law. Except as otherwise provided in Subsection (d) of this Section, the filing of a financing statement is not necessary or effective to perfect a security interest in property subject to:
> . . . .

> (2) R.S. 3:3651 et seq. pertaining to central registry of security interests and liens affecting farm products or standing timber[.]

The procedures for registering security interests in farm products are governed by La. R.S. 3:3651 et seq. La. R.S. 3:3654 establishes a central registry for the filing of security devices and financing statements for farm goods. La. R.S. 3:3654(C) provides for computerized access to the information contained in the central registry. La. R.S 3:3656 sets forth the place of filing and, among other things, the effectiveness of filing against third parties. La. R.S. 3:3656(D) provides:

> The central registry shall reflect the time and date each effective financing statement and other statement is filed. Only a security device with respect to which an effective financing statement

has been filed with the filing officer for inclusion in the central registry, as provided in this Chapter, shall be effective against buyers in the ordinary course of business. Except as otherwise provided in this Section, each security device shall become effective against buyers in the ordinary course of business on the date and at the time an effective financing statement with respect to the security device is filed with the filing officer.

Regarding a secured party's rights on the disposition of collateral and in proceeds, La. R.S. 10:9-315 states:

(a) Disposition of collateral: continuation of security interest; proceeds.  Except as otherwise provided in this Chapter:

(1) a security interest continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest;

(2) a security interest attaches to any identifiable proceeds of collateral; and

(3) a purchaser of collateral incurs no personal liability on account of an unauthorized transfer unless he has failed to act in good faith.

(b) When commingled proceeds identifiable.  Proceeds that are commingled with other property are identifiable proceeds:

(1) if the proceeds are goods, to the extent provided by R.S. 10:9-336; and

(2) if the proceeds are not goods, to the extent that the secured party identifies the proceeds by an acceptable method of tracing.

(c) Perfection of security interest in proceeds. A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected.

(d) Continuation of perfection.  A perfected security interest in proceeds becomes unperfected on the twenty-first day after the security interest attaches to the proceeds unless:

(1) the following conditions are satisfied:

(A) a filed financing statement covers the original collateral;

(B) the proceeds are collateral in which a security interest may be perfected by filing in the office in which the financing statement has been filed; and

(C) the proceeds are not acquired with cash proceeds;

(2) the proceeds are identifiable cash proceeds.

Most notably, Uniform Commercial Code Comment 2 to La. R.S. 10:9-315 provides, in pertinent part:

> Continuation of Security Interest or Agricultural Lien Following Disposition of Collateral. Subsection (a)(1), which derives from former Section 9-306(2), contains the general rule that *a security interest survives disposition of the collateral. In these cases, the secured party may repossess the collateral from the transferee or, in an appropriate case, maintain an action for conversion.* The secured party may claim both any proceeds and the original collateral but, of course, may have only one satisfaction. [Emphasis supplied.]

## Discussion

After reviewing the allegations in Agrifund's petitions and the applicable statutes on conversion, as well as the provisions dealing with the perfection and recordation of security interests in agricultural goods and the provisions specifying that the security interest attaches to the proceeds of collateral, we find that Agrifund has stated a cause of action against the banks for conversion.

ARM first extended a crop production loan to Dickerson and various Dickerson entities, and took a security interest in the crops. That security interest was perfected by filing the requisite UCC-1F forms.[8] Agrifund alleged that it acquired ARM's interests and stepped into the shoes of ARM

---

[8] See and compare *Community Tr. Bank v. First Nat. Bank*, 40,639 (La. App. 2 Cir. 3/15/06), 924 So. 2d 498, dealing with the notice afforded by the filing of UCC-1 and UCC-1F financing statement.

in September 2015.[9]  In January 2016, the security interest in standing crops was converted to a crop storage loan.  Agrifund set forth its allegations regarding the right to assert the security interest in the crop production loan, as well as the crop storage loan, in its second supplemental and amended petition.  By way of illustration, we quote the following allegations.

Paragraph 62 states:

> Effective September 9, 2015, Agrifund closed on a transaction with ARM whereby Agrifund acquired the rights to the Radar Ridge and Dickerson Ag loans, including the ARM Notes and the ARM ASAs with Radar Ridge and Dickerson Ag.

Paragraph 67 states:

> On January 22, 2016, Agrifund entered into a Grain Storage Loan Agreement with Radar Ridge, whereby Agrifund agreed to loan proceeds on Radar Ridge's grain in storage, execute a new Agricultural Security Agreement and secure its portion through a UCC-1F on Radar Ridge's 2015 corn and long grain rice crops.

Paragraph 68 states:

> In connection with the Grain Storage Loan Agreement, Radar Ridge executed a Demand Promissory Note in favor of Agrifund in the principal amount of $3,002,940.00 (hereinafter the "Agrifund RR Note").  The Agrifund Note contains the identical terms and conditions as the ARM notes set forth above.

In Paragraph 74, Agrifund explains:

> Likewise, in connection with the Grain Storage Loan Agreements, Agrifund perfected a security interest securing its position through a UCC-1F on Radar Ridge's and Dickerson Ag's 2015 corn and long grain rice crops.  Agrifund further received by assignment the positions perfected in said crops by ARM's UCC-1F filings.  Also, the loans to Radar Ridge and Dickerson Ag were cross-collateralized.

---

[9] In their briefs, Commercial Capital and McCain dispute the allegation that Agrifund acquired ARM's interests in this matter in September 2015.  However, Agrifund alleged this in its pleadings, this matter is before us for decision on an exception of no cause of action, and the well-pleaded allegations in the petition must be accepted as true.  Whether this allegation can be proven is not before us at this time.

Under the allegations made here, and according to the provisions of the UCC set forth above, the security interest followed the harvested grain. Thereafter, when Dickerson wrongfully sold the harvested crops, as alleged by Agrifund, under the UCC, Agrifund's security interest attached to the proceeds of those sales. According to Agrifund's allegations, when the banks took checks from Dickerson and various Dickerson entities and issued cashier's checks in exchange for them or deposited them into various accounts, some of which did not belong to Dickerson or Dickerson entities, the banks wrongfully received funds which were owned by and owed to Agrifund.

It does not matter whether the banks knew the funds belonged to Agrifund. As specified above, the intent required for conversion is not necessarily that of conscious wrongdoing. The allegations in the petition are sufficient to show that the banks intended to exercise dominion or control over the funds. Possession of the funds was transferred without authority. That exercise of control was inconsistent with Agrifund's rights. This was an act in derogation of Agrifund's possessory rights to the proceeds and deprived Agrifund of the rightful possession of the proceeds.

Based upon Agrifund's allegations, and under La. R.S. 10:9-315, the banks took those funds, rightfully owed to Agrifund, and converted those funds from the company. The well-pleaded facts asserted by Agrifund, accepted as true, support a cause of action for conversion as explained by the comments to this section which we have quoted above.

The trial court's reasons for granting the exception of no cause of action on conversion, asserted by the banks, were not well-founded in the facts or the law applicable to this matter. The trial court focused on the date

40

of Agrifund's crop storage loan in January 2016, and erroneously reasoned that, because Dickerson had disposed of the grain before he transferred the security interest previously existing in the standing crops to the harvested grain, the security interest was not effective. The trial court's reasoning that the transfer of the crop production loan to a crop storage loan would have dissolved a security interest in the proceeds of the sale of the grain is not supported by the law. The trial court also reasoned that actions taken before January 2016 could not have caused damage to Agrifund and that the banks had no legal duty to Agrifund. As discussed above, at this stage of the proceedings, we must accept Agrifund's allegations that it stepped into ARM's shoes in September 2015, and acquired all rights under the crop loan. Agrifund alleges that some sales of grain occurred and some of the checks representing the proceeds from those crops were passed through some of the defendant banks in late 2015, when the crop production loan in favor of Agrifund was still in effect.

The trial court also stated in its reasons for judgment that the banks had no duty to monitor funds deposited into bank accounts which were not in the name of Agrifund. The trial court relied in part on La. R.S. 6:1124, which provides:

> No financial institution or officer or employee thereof shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers or to third parties other than shareholders of the institution, unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary. The fiduciary responsibility and liability of a financial institution or any officer or employee thereof shall be limited solely to performance under such a contract and shall not extend beyond the scope thereof. Any claim for breach of a fiduciary responsibility of a financial institution or any officer or employee thereof may only be asserted within one year of the first occurrence thereof. This Section is not limited to credit

41

agreements and shall apply to all types of relationships to which a financial institution may be a party.

The matter before us is a claim for conversion and not a claim for breach of a fiduciary duty. We also note that, under the jurisprudence, this statute does not provide blanket immunity to banks for any and all causes of action brought by any customer. *See BizCapital Bus. & Indus. Dev. Corp. v. Union Planters Corp.*, 2003-2208 (La. App. 4 Cir. 9/8/04), 884 So. 2d 623, *writs denied*, 04-2473 (La. 1/14/05), 889 So. 2d 267, 04-2505 (La. 1/14/05), 889 So. 2d 268. Agrifund's contention is that the banks should have known that something was amiss, whereas the banks contend they were only engaging in normal banking practices. On an exception of no cause of action, we are unable to resolve this disagreement between the parties. All of these matters concerning banking procedures and standard of care are left for another day.

The trial court did not consider the allegations by Agrifund that the banks also had a duty to report suspicious activity under banking regulations. It also failed to consider any of the law pertaining to the UCC. While the question of the existence of a duty may go to a defense on the merits, as presented here, the question cannot be determined from the pleadings in the context of an exception of no cause of action.

In their brief filed after the argument of this matter before a five-judge panel, FSB, Caldwell Bank, and Commercial Capital assert that, under La. R.S. 10: 9-330 and 331(c), Agrifund's security interest is subordinate to that of the banks and did not attach to the sale of the proceeds of the sale of

grain.[10] They argue that the checks presented by Dickerson were negotiable instruments received by the banks in the normal course of business and the banks were holders in due course, taking priority over any earlier perfected security interest.

La. R.S. 10:9-330 provides:

(d) Instrument purchaser's priority. Except as otherwise provided in R.S. 10:9-331(a), a purchaser of an instrument has priority over a security interest in the instrument perfected by a method other than possession if the purchaser gives value and takes possession of the instrument in good faith and without knowledge that the purchase violates the rights of the secured party.

This provision deals with "chattel paper," which is defined in La. R.S. 10: 9-102(11) as:

"Chattel paper" means a record or records that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods. In this Paragraph, "monetary obligation" means a monetary obligation secured by the goods or owed under a lease of the goods and includes a monetary obligation with respect to software used in the goods. The term does not include (i) charters or other contracts involving the use or hire of a vessel or (ii) records that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card. If a transaction is evidenced by records that include an instrument or series of instruments, the group of records taken together constitutes chattel paper.

In their brief, the banks refer to themselves as purchasers of chattel paper. However, it is not clear that the banks purchased chattel paper in this matter. Therefore the applicability of this provision is questionable.

---

[10] We note that none of these arguments were urged below or considered by the trial court. As part of our *de novo* review, we are considering all of the arguments presented to us and all of the pertinent statutes revealed by our research. We are compelled to note that this case has somehow become a "work in progress." Exceptions of no cause of action are usually not this complicated.

The banks also cited La. R. S. 10:9-331, which states:

(a) Rights under Chapters 3, 7, and 8 not limited. This Chapter does not limit the rights of a holder in due course of a negotiable instrument, a holder to which a negotiable document of title has been duly negotiated, or a protected purchaser of a security. These holders or purchasers take priority over an earlier security interest, even if perfected, to the extent provided in Chapters 3, 7, and 8.

(b) Protection under Chapter 8. This Chapter does not limit the rights of or impose liability on a person to the extent that the person is protected against the assertion of an adverse claim under Chapter 8.

(c) Filing not notice. Filing under this Chapter does not constitute notice of a claim or defense to the holders, or purchasers, or persons described in Subsections (a) and (b).

Agrifund points out in its brief that a holder in due course must be in good faith. The company sufficiently alleged that the banks had some knowledge that Dickerson was not entitled to the proceeds of the checks and raised the inference that the banks were not in good faith, and therefore not holders in due course. While the arguments made by the banks may afford a defense to Agrifund's allegations when the matter is considered on the merits, this issue is not properly considered on an exception of no cause of action where the plaintiff's well-pleaded facts are accepted as true.

We, of course, make no finding on the merits as to whether Agrifund will be able to prove its claims of conversion against the banks. We merely find that Agrifund has sufficiently stated a cause of action for conversion against the banks and should be afforded its day in court to present its evidence.

## CONCLUSION

The trial court judgment finding that Agrifund failed to state a cause of action against Clark A. McCain, Franklin State Bank and Trust Company,

44

Commercial Capital Bank, Brian Wilson, Caldwell Bank and Trust Company, David S. Stephens, Lawrence W. Pickett, Jr., and Lawrence W. Pickett, Jr., a Professional Accounting Corporation, for fraud and conspiracy to commit fraud, and racketeering is affirmed.

The trial court judgment finding that Agrifund failed to state a cause of action against Clark A. McCain, Brian Wilson, David S. Stephens, Lawrence W. Pickett, Jr., and Lawrence W. Pickett, Jr., a Professional Accounting Corporation, for violation of LUTPA, is affirmed.

The trial court judgment finding that Agrifund failed to state a cause of action for the conversion claims against the banks, Franklin State Bank and Trust Company, Caldwell Bank and Trust Company, and Commercial Capital Bank, is reversed.

The matter is remanded to the trial court for further proceedings. Costs in this court are assessed one-half to Agrifund and one-half to Franklin State Bank and Trust Company, Caldwell Bank and Trust Company, and Commercial Capital Bank.[11]

**AFFIRMED IN PART; REVERSED IN PART, REMANDED FOR FURTHER PROCEEDINGS.**

---

[11] In its brief, Caldwell Bank urged this court to affirm the trial court judgment sustaining the exception of no cause of action against it and to order Agrifund to pay its costs and attorney fees under La. C.C.P. art. 2164, which allows the award of such damages for frivolous appeals. Caldwell Bank did not appeal or answer the appeal; therefore, this request was not properly before us. Further, because Agrifund has been granted some relief in this matter against Caldwell Bank, the appeal of the trial court judgment was not frivolous.

45

**STONE, J., dissenting in part.**

I dissent from the majority's opinion regarding both the plaintiff's conversion claim against the defendant banks, and the plaintiff's claim for conspiracy to commit fraud against Caldwell Bank and Trust ("CBT"). The plaintiff has failed to state a cause of action under Louisiana's law of conversion. I would thus affirm the trial court judgment dismissing the plaintiff's conversion claims against the defendant banks. However, the plaintiff did state a cause of action against CBT for conspiracy to commit fraud. I would reverse the trial court judgment on that point.

## CONVERSION

In holding that the plaintiff's petitions state a cause of action for conversion, the majority commits two errors of law. First, unlike the common law, Louisiana's conversion action is predicated on the *fault* of the defendant, *i.e.*, negligence or conscious wrongdoing. The majority ignores this aspect of Louisiana law and applies the common law strict liability standard. This error of law causes the majority to find conversion in the absence of allegations, which, if proven, would establish fault on the part of the bank defendants. Second, the majority expands Louisiana's conversion action in making it available to a secured creditor with a mere *non-possessory, non-ownership* security interest in the property supposedly converted.

*Fault.* Strict liability is "liability without fault." *Celestine v. Union Oil Co. of California,* 94-1868 (La. 4/10/95), 652 So.2d 1299, 1303; *Pepper v. Triplett*, 2003-0619 (La. 1/21/04), 864 So.2d 181, 194, ("the primary difference between ordinary negligence and strict liability is that, with the

latter, the plaintiff need not prove the defendant's actual or constructive knowledge…").

In this case, the majority sets forth a strict liability standard for conversion without actually using the phrase "strict liability":

> *The intent required for a conversion is* not necessarily that of conscious wrongdoing. It is rather *an intent to exercise dominion or control over the goods* which is, in fact inconsistent with the plaintiff's rights. *Mistake of law or fact is no defense*. Persons deal with the chattels or exercise acts of ownership over them at their peril, and must take the risk that there is no lawful justification for their acts. (Emphasis added).

Stated succinctly, that is: "the intent required for a conversion is… [merely]… an intent to exercise dominion or control over the goods." Under this standard, there is no requirement that the defendant have actual or constructive knowledge that the goods belong to another.

The majority's above-quoted language is itself a quote from *Louisiana State Bar Association v. Hinrichs* 486 So.2d 116, 121 (La. 1986), which has been implicitly overruled by *Dual Drilling Co. v. Mills Equip. Investments, Inc.*, 98-0343 (La. 12/1/98), 721 So.2d 853.[12] In *Hinrichs*, the Louisiana

---

[12]As shown *infra*, the Louisiana Supreme Court set forth the requirement of fault in a conversion action over a decade after *Hinrichs*. Notwithstanding, the remainder of the cases that the majority cites as authority for the above-quoted language also quote *Hinrichs, supra*, or ultimately cite common law authority. Specifically, *Jones v. Americas*, 2016-0904 (La. App. 1 Cir. 8/16/17), 226 So. 3d 537, 542, and *Dileo v. Horn*, 2015-684 (La. App. 5 Cir. 3/16/16), 189 So. 3d 1189, 1198, both erroneously cite the same language from *Hinrichs*.

*Deposit Guaranty National Bank v. Central La. Grain Co-op, Inc.*, 1998-1976 (La. App. 3 Cir. 5/5/99), 737 So.2d 167, 172, *writ denied sub nom. Deposit Guar. Nat. Bank v. Cent. Louisiana Grain Co-op, Inc.*, 99-1582 (La. 9/17/99), 747 So. 2d 564, is

2

Supreme Court cited common law authorities for the above-quoted language. Under the common law's strict liability tort of conversion, and the majority's recital of the rule in this case, the defendant's intent to exercise dominion or control over the goods is sufficient intent for conversion. That is so regardless of whether the defendant knew or should have known that the movable belongs to another. Thus, as stated by the majority, "mistake of fact or law is no defense."

As previously noted, the cases that the majority cites as support are in conflict with current Louisiana law.[13] *Dual Drilling Co. v. Mills Equip. Investments, Inc.,* 98-0343 (La. 12/1/98), 721 So.2d 853, articulates Louisiana's current law regarding the tort of conversion. Therein, the Louisiana Supreme Court repudiated the strict liability tort of conversion, and instead, held that in Louisiana "the conversion action is predicated on the *fault* of the defendant." *Id.* at 857. (Emphasis added).

The *Dual Drilling* court explained:

> Despite the use of this common law term [*i.e.*, conversion], such actions are not to be confused with the civil law tort of conversion. In common law jurisdictions, conversion is an intentional wrong giving rise to strict liability in an action for the recovery of the value of a chattel…[T]ortious activity is only established upon proof of fault under La. Civ. Code art. 2315 as opposed to the common law allowance of strict liability

*Id.* at n.3.

_____

even more explicit in its assertion of strict liability for conversion: "issues of fault, intent, negligence, knowledge or ignorance, and/or good faith are not involved in actions for tortious conversion." *Id.* at 572. *Deposit Guaranty* cited ultimately to *Prosser & Keeton on The Law of Torts* (common law authorities) as support for the quoted language.

[13] Footnote 1 to this dissent.

3

As previously stated, strict liability is "liability without fault." *Celestine, supra.* In the context of conversion, "the primary difference between negligence and strict liability is that, with the latter, the plaintiff need not prove the defendant's actual or constructive knowledge" that the property belongs to another. *Pepper, supra; See also Dual Drilling, supra.*

In Louisiana, "fault," and thus conversion, requires negligence or conscious wrongdoing. *Dual drilling, supra*; *MCI Communications Services, Inc. v. Hagan,* 2011-1039 (La. 10/25/11), 74 So. 3d 1148. Thus, in finding fault (negligence) on the part of the defendant, the *Dual Drilling* court stated:

> Southern *should have realized* Rig 25 was not part of the sale and was not to be dismantled upon seeing the flourescent [sic] orange "Do Not Cut" markings on the rig. The trial court found Southern *knew or should have known* that the rig belonged to someone other than the Partnership but failed to ascertain the identity of the true owner. Southern could have acted to prevent itself from destroying the wrong rig. Instead, *precautions to find the owner were not taken.* (Emphasis added).

*Dual Drilling* at 857.

In *MCI Communications, supra,* the Louisiana Supreme Court reaffirmed the above principles set forth in *Dual Drilling, supra.* The defendant accidentally severed the plaintiff's cable while excavating on the premises. The Louisiana Supreme Court again rejected the common law strict liability approach, and held that Louisiana law requires at least negligence to impose liability.[14]

---

[14] The facts of *MCI Communications* apparently would have established liability under the common law theory of "trespass to chattels," (which differs from the common law theory of "conversion" only in the degree of damage or interference inflicted by the defendant on the plaintiff's property). *Id.* at 1151-2. However, the Louisiana Supreme Court held that, the trial court's instruction on negligence was sufficient, and that, under Louisiana law, the plaintiff was not entitled to an instruction on the common law strict liability tort of "trespass to chattels."

In this case, the majority justifies its affirmative finding of conversion as follows: "It does not matter whether the banks knew the funds belonged to Agrifund…[T]he banks intended to exercise dominion or control over the funds," and actually carried out those intentions; therefore, "[t]he well pleaded facts asserted by Agrifund, accepted as true, support a cause of action for conversion." Thus, not only did the majority recite a strict liability standard in its discussion of the law, it actually applied a strict liability standard in finding that Agrifund stated a cause of action for conversion.

The majority's application of strict liability has led it to an erroneous conclusion. The allegations of the petition, even if proven, are insufficient to establish fault on the part of Franklin State Bank ("FSB") or Commercial Capital Bank ("CCB") in receiving the subject funds. Specifically, the allegations do not establish that FSB or CCB knew or had reason to know that Kennedy Rice Dryers checks #1777 & #1778 constituted proceeds of another lender's collateral.[15] Indeed, CCB is merely alleged to have received

---

[15] For the reader's convenience, I will restate the allegations of the relevant transactions. In January of 2016, collateralized rice grown on FSN 6942 entered the Kennedy facility in the name of W & T Farms, a Dickerson entity that is not a debtor on the subject loans. Kennedy sold that grain in the name of W & T Farms. Upon selling this rice to third parties, Kennedy issued checks 1777 and 1778, which were payable jointly to: (1) W & T Farms; (2) FSB; and (3) Crop Production Services.

Clark McCain endorsed check 1777 on FSB's behalf. Thereafter, on February 1, 2016, Kennedy check 1777 was deposited in Dickerson's account at CCB. From there, the funds were transferred into checking accounts for Radar Ridge and Tough Luck at CCB and were used to help fund the payment of farmhand payroll checks and other recurring expenses.

Clark McCain also endorsed check 1778 on behalf of FSB; it was also endorsed "For Deposit Only Crop Production Services" and the funds were deposited accordingly. The petition does not allege who, if anyone, endorsed the check on behalf of Crop Production Services.

At the time McCain endorsed the checks for FSB, W & T Farms had no outstanding debt to FSB, but had issued W & T a $1,229,844 loan which was repaid in August 2015. The plaintiff makes no allegation that the lien filing in the Central Agricultural Registry associated with this loan was canceled. Filed agricultural liens remain in that public registry until canceled in accordance with La. R.S. 3:3656, regardless of whether any debt remains outstanding.

5

proceeds of those proceeds via a check drawn a Dickerson-controlled FSB account.

***Interference with ownership or possession.*** *Dual Drilling* defined conversion as "the unlawful interference with the *ownership or possession of a movable,*" and explained that "conversion… is… securely rooted in *civilian* concepts of *property* law." *Dual Drilling* at 857. (Emphasis added). Thus, the terms "ownership" and "possession," in the context of conversion, carry their technical legal meaning. The plaintiff's actual ownership or possession of, or right to possess,[16] the property *at the time of the supposed conversion* is essential to the conversion action.

In this case, the plaintiff's allegations *of fact* show that the plaintiff never had possession or ownership of the collateralized grain or proceeds thereof.[17] Instead, these allegations indicate that the plaintiff had a mere non-

---

Additionally, the plaintiff alleges that it was the only "area lender" that financed production of rice on FSN 6942, and that FSB specifically did not finance the production of rice on that farm.

**FSB.** The plaintiff's petitions do not allege that the Kennedy checks themselves bore any indication of the farm from which the crops sold came. Instead, they merely referenced Long Grain Rice settlement #002980 and #002981. The plaintiff admits in its petitions that these "settlements" were separate documents, and only on those separate documents was the farm serial number ("FSN") of the farm from which the crops came stated. The plaintiff makes no allegation that FSB had any access to those Long Grain Rice Settlement documents. Thus, the plaintiff has failed to his state any reason for FSB to know that Kennedy checks 1777 & 1778 represented proceeds of grain grown on FSN 6942, *i.e.*, a farm regarding which FSB had made no loan for the 2015 crop year. Thus, FSB is not alleged to have any reason to know that the checks constituted proceeds of another lender's collateral.

Furthermore, the plaintiff's assertion that FSB should have been suspicious because it was named as a payee when W & T Farms had already repaid its debt in full is without merit. Presumably, Kennedy issued the check with FSB as a co-payee based on the lien which apparently remained in effect vis-à-vis the public registry. FSB's mere endorsement without collecting any funds is consistent with such a situation and does not tend to establish fault on the part of FSB.

**CCB.** Likewise, CCB has not alleged to have any reason to know that the funds it received via a check drawn on a Dickerson -controlled FSB accounts constituted proceeds of another lender's collateral.

[16] La. C.C. art. 3422.

[17] The plaintiff has made conclusory allegations of ownership of and "entitlement to" the collateral proceeds (and that plaintiff is the "rightful owner" of the proceeds) that were channeled through the defendant banks.

possessory security interest in the collateral. Additionally, the plaintiff's counsel admitted in the initial oral arguments before this court that the plaintiff merely had a non-possessory security interest in the collateral, *i.e.*, that it had no ownership or possession of, or right to possess the collateral.

Regardless, the majority states "the banks wrongly received funds which were *owned by* and owed to Agrifund." (Emphasis added). Assuming the allegations of the petition are true, Agrifund merely had a contractual right to be paid the proceeds, and had a security interest in the proceeds. The majority's statement that Agrifund "owned" the proceeds is incorrect. The majority cites no allegation of the petition nor any law for the proposition that, upon disposition of the collateral, the secured creditor somehow automatically becomes owner of the proceeds. Indeed, the majority extensively explains that, upon disposition of the collateral, Agrifund's *security interest* automatically attached to the proceeds and became perfected. It is axiomatic that a UCC security interest is separate and distinct from ownership.[18]

Thus, what the majority actually holds is that creditor with a non-possessory, non-ownership security interest the collateral's proceeds has a

---

[18] Nor does a U.C.C. security interest confer rights similar to ownership, especially in Louisiana. "Ownership is the right that confers on a person direct, immediate, and exclusive authority over a thing." La. C.C. art. 477. In reality, the debtor is typically the owner of the collateral, and a secured creditor is legally prohibited from taking possession of the collateral even upon the owner/debtor's default, unless: (1) the debtor abandons the collateral; (2) the debtor consents to the creditor's taking possession by reason of actual or imminent default; or (3) such is done pursuant to judicial process. La. R.S. 10:9-609 and comments thereto. As reflected in those comments, Louisiana has rejected "a general authorization of self-help repossession of the collateral by secured parties… [provided for by]… Revised U.C.C. Article 9." In Louisiana, unlike states which have not deviated from the U.C.C. model provisions, a secured creditor must generally use judicial process to re-possess, seize, or foreclose upon collateral or proceeds thereof. As further example, La. C.C. art. 3140 provides that: "Unless expressly permitted by law, clause in a contract providing in advance that ownership of the thing given as security will transfer upon default in performance of the secured obligation is absolutely null."

(strict liability) conversion action against a third party to whom the debtor transfers the proceeds – as well as transferees of the debtor's transferee, and so forth, theoretically *ad infinitum*. The majority's incorrect assertion that Agrifund "owned" the proceeds indicates that the majority has conflated *actual* ownership with *anticipated future* ownership–at least to the extent that such anticipation is based upon a contractual right and a perfected security interest in the subject property. The majority does not acknowledge that its decision thusly expands Louisiana's conversion action, and therefore makes no attempt to justify doing so.

Of all the conversion cases cited by the majority, only *Deposit Guaranty National Bank v. Central Louisiana Grain Co-op, Inc.* 98-1976 (La. App. 3 Cir. 5/5/99), 737 So.2d 167, provides support for the proposition – that a creditor with a mere non-possessory, non-ownership security interest, who never in fact had possession of the collateral or proceeds thereof – may maintain an action for "conversion" of the proceeds of its collateral. Like the plaintiff in this case, the plaintiff in *Deposit Guaranty* had merely an anticipation of future possession based on its security interest and its apparent contractual right to be paid. As shown by the italics below, the Third Circuit stated its holding in *ipse dixit* fashion:

> *A conversion consists of an act in derogation of the plaintiff's possessory rights*, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion. Issues of fault, intent, negligence, knowledge or ignorance, and/or good faith are not involved in actions for tortious conversion. A mistake of law or fact is no defense. Persons deal with the property in chattels or exercise acts of ownership over them at their peril, and must take the risk that there is no lawful justification for their acts.
> *We conclude that the facts of the instant matter fit within the above-quoted description.* Therefore, we reverse the

8

judgment of the lower court. (Internal citations omitted; emphasis added).

*Id.* at 172-173. The *Deposit Guaranty* court, similar to the majority in this case, did not even attempt to reconcile its conclusion – that a creditor with a non-possessory security interest which never in fact had possession had an action for conversion – with its own statement that conversion requires interference with *possession*.[19]

The majority also relies on "Uniform Commercial Code Comment 2" under La. R.S. 10:9-315. This comment is not specific to Louisiana law. Instead, it is merely a comment to the generic Uniform Commercial Code, *i.e.*, a model code which presupposes application of the common law. The majority's piecemeal importation of common law in allowing a secured creditor with no possession or ownership a strict liability conversion action potentially poses a danger to many transferees of movable property who are subject to Louisiana law.

### Conspiracy to commit fraud

To establish conspiracy, a plaintiff must prove that: (1) an agreement existed to commit an illegal or tortious act; (2) the act was actually committed; (3) the act caused the plaintiff's injury; and (4) there was an agreement as to the intended outcome or result. *Crutcher-Tufts Res., Inc. v. Tufts*, 2009-1572 (La. App. 4 Cir. 4/28/10), 38 So. 3d 987, 991. In *Prime Ins. Co. v. Imperial Fire & Cas. Ins. Co.*, 2014-0323 (La. App. 4 Cir. 10/1/14), 151 So. 3d 670, 677, *writ denied*, 2014-2241 (La. 1/9/15), 157 So. 3d 1110, the Fourth Circuit explained:

---

[19]Also, as previously noted, the language from *Deposit Guaranty* to the effect that conversion is a strict liability tort, quoted *supra*, conflicts with the Louisiana Supreme Court decision in *Dual Drilling*.

9

Proof of a conspiracy can be by "actual knowledge of both parties or overt actions with another, **or can be inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator**." *Stephens v. Bail Enforcement of Louisiana,* 96–0809, p. 10 (La. App. 1 Cir. 2/14/97), 690 So.2d 124, 131. "The plaintiff must therefore prove an unlawful act and assistance or encouragement that amounts to a conspiracy. **The assistance or encouragement must be of such quality and character that a jury would be permitted to infer from it an underlying agreement and act that is the essence of the conspiracy**." *Chrysler Credit,* 51 F.3d at 557. (Emphasis in original).

In this case, the plaintiff has stated a cause of action for fraud in alleging that Dickerson misrepresented the amount of grain available as collateral, surreptitiously sold collateralized grain in contravention of the security agreement, and channeled the collateral's proceeds through the defendant banks in an effort to defeat the security interests therein. However, the plaintiff does not allege that it communicated in any way with any of the appellants in the course of events leading to the filing of this lawsuit. Nor was there any duty to initiate such communication on the part of any of the appellants. Therefore, the appellant's respective liability for fraud, if any, would necessarily be based on conspiring with Dickerson in his fraud. As described below, a CBT employee so conspired with Dickerson.

10

Kennedy Rice Dryers check #1740, which represented proceeds from the sale of rice that was subject to the plaintiff's security interest, was made payable jointly to Yes Farms and CBT. The rice so sold initially entered the Kennedy grain elevator facility in the name of Dickerson Ag, *i.e.,* an entity indebted to the plaintiff on the subject loans. However, before the grain was sold, it was transferred to Kennedy's customer account for Yes Farms, *i.e.*, Dickerson-controlled but not indebted to plaintiff on the subject loans.

Dickerson negotiated Kennedy check 1740 to CBT in return for two CBT cashier's checks which had the following characteristics: (1) both stated that the remitter was Yes Farms; (2) one was payable to Joseph Blake Lively ("JBL"); (3) the plaintiff makes no allegation regarding the payee of the other cashier's check. However, both CBT cashier's checks were temporarily deposited into JBL's personal checking account at CBT, but were shortly thereafter used to purchase additional CBT cashier's checks made payable to Commodity Credit Corporation with Dickerson Ag and JBL as remitters. JBL allegedly had no knowledge of, and gave no authorization regarding these transactions. The plaintiff makes no allegations regarding the identity of the CBT employee involved in these transactions, which apparently constituted serious violations of CBT policy.[20] Finally, at the time that Dickerson negotiated these checks to CBT, Yes Farms had no

---

[20] In March 2016, *i.e.*, roughly a month after the plaintiff discovered Dickerson's scheme, CBT president Monty Adams stated that it was bank policy to not allow "customers to deposit checks made out to corporations into their personal checking accounts and vice versa.…[and that] any check made out to a corporation should be deposited into the corporate account…[to]…which it is made payable…and not cashed or deposited elsewhere," that failure to follow these policies was a violation of "banking 101" and that the Dickerson situation was a "monumental problem."

outstanding debt to CBT, and had no CBT account into which the check could be deposited.

The above allegations, if proven, would permit a jury to infer an agreement on the part of the CBT employee involved to facilitate Dickerson's circumvention of another's interest in the funds. The transactions involving the unauthorized use of JBL's personal checking account smacks of deliberateness and chicanery on the part of the CBT employee who conducted these transactions. A jury should easily be permitted to infer intent to assist Dickerson in some type of wrongdoing from the overt and conscious impropriety on the part of the CBT employee involved. These transactions flagrantly violated CBT policy, and were obviously designed to have the effect of facilitating Dickerson's ultimate disposition of the funds as he wished. Thus, assuming these allegations are true, a jury could properly infer that the CBT employee involved knew that Dickerson was circumventing *someone's* interest in the funds. The majority errs in suggesting that it was necessary that Dickerson's co-conspirator have intent regarding Agrifund in particular.

## CONCLUSION

For the foregoing reasons, I **DISSENT** in part.